3 A.3d 1201

**STATE of Maryland**

v.

**Kevin George DIGENNARO.**

**No. 5, Sept. Term, 2009.**

Court of Appeals of Maryland.

Aug. 31, 2010.

552

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, of Baltimore, MD), on brief, for Petitioner.

Amy E. Brennan, Asst. Public Defender (Nancy S. Forster, Public Defender, of Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Harford County, a Grand Jury returned a six count indictment that included the following charges:

The Jurors of the State of Maryland, for the body of Harford County, do on their oath present that KEVIN GEORGE DIGENNARO[, Respondent], on the 21st day of March 2005, in the County aforesaid, unlawfully did cause the death of [the victim], while driving, operating and controlling a vehicle in a grossly negligent manner, against the peace, government and dignity of the State.
(Manslaughter by vehicle or vessel—CR 2–209—1 0909)

\*　　\*　　\*

## SIXTH COUNT

AND, the Jurors aforesaid, upon their oath aforesaid, do further present that KEVIN GEORGE DIGENNARO, on the said day, in the County aforesaid, did unlawfully fail to remove dirt and debris from a highway which had fallen from a vehicle that he was operating in violation of Transportation Article § 24–106, against the peace, government and dignity of the State.
(Failure of vehicle owner to remove debris—Transportation Article [ (TA) ] § 24–106(e))

At the conclusion of a bench trial, the Circuit Court convicted Respondent of manslaughter by vehicle, and of the TA § 24–106(e) violation.[1] The manslaughter by vehicle conviction was reversed by the Court of Special Appeals in *DiGennaro v. State*, 182 Md.App. 624, 959 A.2d 105 (2008). The State then filed a Petition for Writ of Certiorari, in which it presented this Court with the following question:

---

1. In the other four counts of the indictment, Respondent was charged with reckless driving, negligent driving, operating a vehicle when the tailgate was not closed (in violation of TA § 24–106.1), and operating a vehicle with a load that endangered other users of the highway (in violation of TA § 24–106(c)). The Circuit Court acquitted Respondent of those charges.

[I]s the term "operating" contained in Section 2–209 of the Criminal Law Article, different from the terms "driving" and "controlling," also included in Section 2–209, and, if so, does the term "operating" encompass the failure of the driver of a vehicle to perform duties that the driver is legally obligated to perform as a result of his driving the vehicle?

We granted the Petition. 407 Md. 276, 964 A.2d 675 (2009). For the reasons that follow, we hold that the definition of "operating" in CL § 2–209 is identical to the definitions of "drive" and "operate" in the Transportation Article (TA). We shall therefore affirm the judgment of the Court of Special Appeals.

### Background

The opinion of the Court of Special Appeals includes the following factual summary:

On the morning of March 21, 2005, [Respondent] was driving a dump truck northbound on Route 136 in Harford County, hauling a load of gravel to a quarry in Churchville. In attempting to lower the truck's third axle, he, in the circuit court's words, "hit[ ] the wrong button," accidentally releasing approximately 3,480 pounds of gravel onto Route 136. The spill comprised three separate concentrations of gravel that, all together, covered over 800 feet of the northbound lane of Route 136.

Observing, in his side mirror, gravel spewing from the rear of his truck, [Respondent] pulled over to the side of Route 136, just south of the entrance to the Churchville quarry. When he got out of the truck, [Respondent] saw what he later described to police as a "small amount of gravel" directly behind his vehicle. After kicking some of the gravel off the road, he got back into the truck and drove to the quarry.

As he entered the quarry, [Respondent] placed a call, on his cell phone, to James Enders, the owner of the contracting firm that employed him, and told him, Enders would later recall, that he had "sprinkled" some gravel onto the

road leading into the quarry. Concluding from [Respondent's] words and tone that there was no immediate cause for concern, Enders responded that a "loader" would "come out" and scrape the stray stones from the entrance road. The call ended, and [Respondent], after emptying his truck of its cargo, departed for Perryville, Maryland, to pick up a supply of sand.

Shortly after the spill occurred, [the victim's mother] was driving her car northbound on Route 136, accompanied by her two small sons[.] Proceeding along a route she customarily drove to her mother-in-law's home, [the victim's mother] did not see the gravel left by DiGennaro's truck before her car entered the first concentrated stretch of gravel. By that time, it was too late. Skidding on the gravel beneath her vehicle, she lost control of her car and spun into the path of an oncoming BMW.

The BMW collided with [the victim's mother's] car. [The victim's mother and the victim's brother] suffered substantial injuries but survived the accident. Tragically, [the victim] did not. The force of the accident snapped his neck, and he died at the scene of the accident.

Dispatched to the accident scene, Trooper Douglas Forrester of the Maryland State Police traveled along the same portion of gravel-covered roadway that [the victim's mother] had. As he passed through it, he, too, lost control of his car, but only momentarily. The scene struck him as "surreal." "[A] part of the roadway," he explained, "was completely covered with stone and gravel . . . like it was snow covered."

After being contacted by the State Police, James Enders called [Respondent] and informed him that the State police wanted him to meet them immediately in the parking lot of the WaWa store at the corner of Routes 136 and 543. When [Respondent] arrived at that location, the troopers read him his Miranda warnings, after which a trooper asked him "what had happened that morning." [Respondent] responded that he had accidentally dropped some gravel

from his truck, and that, after pulling over, he noticed a "small amount" of gravel on the road.

The troopers then drove [Respondent] to the accident scene, stopping at the spot where [Respondent] told them he had stopped his truck to view the discharged gravel. Asked by one of the troopers whether he could see the heaviest concentration of gravel, which, of the three separate accumulations, was farthest from where they were standing, [Respondent] said he could. And, later at trial, one of the troopers testified that, looking south along Route 136, he had "no [trouble] at all" seeing the full span of all three concentrations of gravel.

*DiGennaro v. State*, 182 Md.App. 624, 626–628, 959 A.2d 105, 106–108 (2008).

Respondent's trial began with the prosecutor's opening statement, which included the following assertions:

The State's position here is that perhaps the initial grabbing of the wrong control and dumping this matter on the roadway may have been only simple negligence. But what Mr. Digenarro did after that in allowing this material to lay on the roadway, which caused this accident, was, in fact, gross negligence, which should constitute a basis for a charge of manslaughter and evidence of manslaughter under the circumstances.

At the conclusion of the State's case-in-chief, Respondent's trial counsel made a "motion for judgment of acquittal with regard to the count of manslaughter," and stated:

And candidly, the Court views it in the light most favorable to the State at this point, and being that as it is, I suspect that the Court's going to deny the motion. But I would like to point out to the Court that manslaughter is a criminal offense, which requires wanton disregard and gross negligence, which I know this Court is more familiar with than I am because I haven't done a civil practice. And that's the same standard as carried over into . . . 2–209 as was the common law allowing—that is the case of *Lilly v. State*, [212 Md. 436, 129 A.2d 839 (1957) ] and *Blackwell v. State* [34

Md.App. 547, 369 A.2d 153 (1977) ]—ask [sic] to continue with that same type of, if necessary, evidence, even after the statutory revisions of 2–209.

Your Honor, this is a case where there's no doubt Mr. Digennaro was very negligent when he discharged the load on the highway. He made an effort to make a phone call to this boss to let him know what happened. And quite candidly, I don't think the owner of this vehicle was totally candid with the Court. He said he never told him it was on the road. Well, be that as it may, the liability for the criminal negligence in this case seems to be that—Well, I'm not sure what it seems to be, because, clearly, he wasn't able to clean up that gravel.

We know what was used, a very large vehicle of equipment, to clean that gravel up. There's some allegation that if he didn't clean it up, he had some duties to try to warn motorists who were approaching the scene, and to do that, he apparently had three triangles which he could have set out.

The problem is, the testimony from everybody has been that as you approach to roadway, you don't see it. Both the officer and according to the child's mother, said they were on it before they saw it. So if you put those triangles out there somewhere, probably no one knows what that really meant. The cars approaching the scene would not have seen it in any event. Well, generally, there's no way of knowing because it's not something you can see in the road before you are on it.

So both the officer and the young child's mother ended up on the gravel before they were aware that it's there. And that's if you believe for a minute that he appreciated the seriousness of the situation. And I say that because he's 800 feet—and the testimony seems to have been that the heavy concentration is down here and it gets lighters, apparently that is the light portion extending further, and then it's a total of 800 feet to get up where the truck is. And looking back some 800 feet, I have no doubt he's well beyond any viewpoint where I am now. I have no doubt

that you see something down there, but you have to also believe that having seen that down there, you can appreciate the serious situation that it presents.

Even if you knew it was gravel, I'm not sure you've got to appreciate the serious condition that it presents for other motorists. Of course, it's doubtful if he knew exactly how much was down there.

The point I'm making is, that the guilt of a wanton disregard, you would have to know the danger, and knowing the danger, act with total reckless disregard for the life of others. And in this case, it's not at all clear that he even understood the danger.

Nor—understands this. The boss, who owned the truck, told him that this was a very dangerous endeavor removing gravel you spilled on the roadway and that you have to be very careful and cautious. But even the boss admitted he gave no training. He didn't see that as a particularly serious problem and it wasn't really discussed in any detail.

There's really no reason to think that he's even aware of the situation that he probably had created when he called his boss and says, "I spilled some gravel on the roadway."

Even the light most favorable to the State, I don't think the State's made out a case of gross negligence in this case.

The following transpired during the prosecutor's response to Respondent's motion:

He could have backed the dump truck up so that people approaching that would have a large red dump truck to see as opposed to trying to see a small triangle or something.

But this is an issue that appears to be responsibility here at this point in time. And to neglect that responsibility as the cases have said, there can be found a wanton and reckless disregard of the rights and lives of others in criminal indifferences to the consequence where you have a legal obligation to clean up what's spilled from the road and you drive away and leave it there.

And obviously, the danger, the fact that not only did [the victim's mother] lose control, but the first responding troop-

er lost control. There's an obligation on the defendant to examine the scene not to just jump out, close the gate, look around and kick some stones off the driveway.

I think the fact that the defendant was kicking stone off the road and calling his boss was an indication that he was aware of the seriousness and how much worse this was. And I would argue to the Court that I think clearly, where he should've appreciated the incredibly dangerous situation that he has created and drives away without fulfilling his legal obligation and without doing anything in terms of marking this or calling it to the attention of someone to say, you know, "We got to get somebody out here to clean this up," I think he's responsible legally from the standpoint of gross negligence for the death of [the victim].

THE COURT: **Let me make sure that I understand your argument. You are not saying by engaging the wrong button that it was grossly neglect in that respect?**

\* \* \*

**So he wasn't grossly negligent by engaging the wrong button, but after he did so, it's your contention that the spillage was in plain sight from the beginning, which is the crest of the hill, all the way to what you referred to as the third area of debris; and that he should have seen it because it was in plain sight, and Trooper Orner testified to that;**

**And that he was grossly negligent by failing to do one of either two things: Either failed to clean it up, which may not have been a possibility;**

**But he also failed to adequately mark the area and warn approaching motorists of the impending danger. Is that your argument?**

[THE PROSECUTOR]: **Yes, that's my argument.**

(Emphasis added).

After listening to final arguments, the Circuit Court rendered its verdict and stated the following grounds for its decision:

THE COURT: Well, in this case as in all criminal cases before this Court, the burden of proof is on the State to prove beyond a reasonable doubt that the defendant committed the crimes alleged. And the State has the burden of proving beyond a reasonable doubt that each element of the crime is, in fact,—that the charges are proved beyond a reasonable doubt.

Now with respect to the charge of manslaughter by motor vehicle, there's no dispute that the defendant drove and operated a motor vehicle on March 21 of 2005, and there's no dispute that his conduct, the accident in hitting the wrong button, caused a great deal of gravel to deposit on the roadway in question, Route 136.

And perhaps that's a negligent act. Certainly is negligent, but not grossly negligent. **The question then is: Did his subsequent conduct constitute conduct or action in a grossly negligent manner, that is, a manner that created a high degree of risk to human life, and that this negligent conduct ultimately caused the death of an individual?**

I do not think that—well, there is no question but that the death was a result of the accident. So the very narrow question before the Court is: Was the conduct of the defendant grossly negligent?

**I believe that he has a duty, a statutory duty which is set forth in 2–4106 E, to clean up and remove any debris that he caused to be deposited on a public highway.** So therefore, clearly, a driver is put on notice of his duty and certainly someone with a commercial license is aware of that.

Now I think the evidence has shown beyond a reasonable doubt that the gravel on the highway on that day in question was in plain view. I believe that as a reasonable inference for this Court, I believe that when the driver, the defendant in this case, got out of his truck and looked up the highway, that the entire 800 feet of highway was visible to him.

And I believe because of that he had some obligations. **He had an obligation to clear the highway. That may not have been physically possible, given the time before the accident. In failing that, I believe that he had a duty to clearly mark the area so that any approaching motorists would be aware of the highly dangerous situation created by a substantial amount of loose gravel on the highway. He failed to do that.**

He failed even to notify the quarry apparently when he reported his load, that, in fact, a dangerous situation existed within minutes of their business. And I think the failure to mark, to either—I don't think, [Respondent's trial counsel], your assessment that he couldn't take his truck down there and mark it with signs or somehow flag down motorists until he could get help. I think he had an obligation to do that.

So therefore, **I will find that he did act in a grossly negligent manner by failing to mark the area to warn approaching motorists, or even to notify the quarry in an attempt to get someone out there to immediately clean it up.** And I also find that this grossly negligent conduct did, in fact, cause the death of [the victim] in this case. So I find him guilty of that particular crime.

**I find him not guilty of negligent or reckless driving because the act that was committed wasn't a result of him driving the vehicle[.]** ... [The] homicide statute makes a distinction between the three methods or the three actions: Driving, operating or moving. The negligent act wasn't because of the driving, it was what happened afterwards in the operation of the vehicle following actions that should have been taken.

**I also find him not guilty of securing those materials. This was an accidental discharge. I find him guilty, however, of failing to clear the debris from the roadway that was put there, or at least taking some action in anticipation of clearing that roadway, or attempting to. He didn't do that. Guilty as to manslaughter; guilty find-**

ing as to failing to clear the roadway; not guilty of the other two counts.

(Emphasis added).

The Court of Special Appeals reversed the manslaughter by vehicle conviction,[2] holding that "[Respondent's] failure to mark the gravel he had spilled onto a public roadway or notify the quarry of the spill did not constitute "operating . . . a motor vehicle" under [CL] § 2–209." *Id.* at 632, 959 A.2d at 110.

## Discussion

Manslaughter by vehicle is proscribed by Section 2–209(b) of the Criminal Law Article,[3] which, in pertinent part, provides: "A person may not cause the death of another as a result of the person's driving, operating, or controlling a vehicle . . . in a grossly negligent manner." The Circuit Court expressly found that Respondent acted "in a grossly negligent manner by failing to mark the area to warn approaching motorists, or even to notify the quarry in an attempt to get someone out there to immediately clean it up," and that "[t]he negligent act wasn't because of his driving, it was what happened afterwards in the operation of the vehicle following actions that should have been taken." While reversing Respondent's manslaughter by vehicle conviction, the Court of Special Appeals stated:

· The conduct which underlay [Respondent's] conviction for vehicular manslaughter, namely, his failure either to mark the area where gravel had spilled from his truck or to notify the quarry of the presence of this gravel, had nothing to do with either starting his truck's engine or manipulating its

---

2. Because Respondent's case was not tried before a jury, the question of evidentiary sufficiency was properly before the appellate court even though Respondent's trial counsel did not argue to the Circuit Court that Respondent could not be convicted of manslaughter by vehicle by negligently failing to take *post-operation* remedial action. Md. Rule 8–131(c); *Harrison v. State,* 382 Md. 477, 487 n. 12, 855 A.2d 1220, 1225 n. 12 (2004).

3. Md.Code Ann., Crim. Law § 2–209 (2002).

mechanical or electrical devices. Hence, in failing to take either of the aforementioned actions, [Respondent] was not "operating" his vehicle, as that term has been construed by the Court of Appeals. In sum, as logical or even as desirable as it might be to extend the meaning of the term "operate" to include the removal or remediation of the very dangers created by the operation of a vehicle, we have no statutory or decisional basis to do so.

\* \* \*

Finally, we do not question that [Respondent] had an obligation to remediate the hazard created when he spilled gravel from his truck onto a public roadway, and we are painfully aware that his failure to satisfy this obligation produced tragic consequences. But, [Respondent] was prosecuted for vehicular manslaughter, not for common law manslaughter, and his conviction of that offense required an interpretation of "operate," as used in § 2–209, clearly at odds with the way this term is commonly understood and has heretofore been interpreted and applied.

182 Md.App. at 631–32, 959 A.2d at 109–110.

■ "Two statutes which deal with the same subject matter are *in pari materia*, should be construed together and, to the extent possible, harmonized." *State v. Thompson*, 332 Md. 1, 7, 629 A.2d 731, 734 (1993) (internal citations omitted). To determine whether Respondent's post-accident conduct constituted the "operating" of a vehicle, the Court of Special Appeals was correct in its conclusion that CL § 2–209 should be harmonized with Maryland Code (1977, 2009 Repl. Vol.), Transportation Article (TA), which includes a definition of the term "drive" and of the term "operate." TA § 11–114 provides: " 'Drive' means to drive, operate, move, or be in actual physical control of a vehicle, including the exercise of control over or the steering of a vehicle being towed by a motor vehicle." TA § 11–141 provides: " 'Operate', as used in reference to a vehicle, means to drive, as defined in this subtitle."

■ We agree with the Court of Special Appeals that the term "operate" as used in CL § 2–209 is synonymous with the

definitions of "drive" and "control" in the Transportation Article,[4] and therefore hold that a defendant cannot be convicted of manslaughter by vehicle unless the victim died as a result of grossly negligent conduct that occurred while the defendant was actually operating a vehicle. In light of the State's theory of the case against Respondent, and the factual findings of the Circuit Court, the victim's death was not *caused* by Respondent's negligent *operation* of a vehicle, but rather by Respondent's failure to take appropriate *post-operation* remedial action as a result of what occurred while he had been operating the vehicle. Under these circumstances, we affirm the holding of the Court of Special Appeals that "[Respondent's] failure to mark the gravel he had spilled onto a public roadway or notify the quarry of the spill did not constitute "operating ... a motor vehicle" under [CL] § 2–209."

Although Respondent could not have been convicted of manslaughter by vehicle, he could have been convicted of common law involuntary manslaughter upon proof beyond a reasonable doubt that (1) even though his operation of the vehicle was neither reckless nor negligent, as a result of what occurred while he had been operating that vehicle, TA § 24–106(e) imposed upon him a duty to take appropriate remedial measures on behalf of other users of the highway;[5] (2) he failed to perform that duty with reckless indifference to the issue of whether his inaction was endangering other users of Route 136; and (3) under the circumstances, that failure

---

**4.** Our conclusion is consistent with dictionary definitions of "drive" and "operate." Webster's defines operate as "to run or function effectively," "to have an effect or influence," or "to control or direct the functioning of." Webster's II New College Dictionary 767 (Houghton Mifflin Company 2001). Drive is defined as "to push, propel, or press onward forcibly," "to guide, control, or direct (a vehicle)," or "to supply the motive force to and cause to function." *Id.* at 346.

**5.** TA § 24–106(e) provides: *Removal of debris.*—The owner of a vehicle from which dirt, debris, or agricultural products has fallen on any highway is responsible for removing that dirt, debris, or agricultural products within a reasonable time.

constituted gross negligence.[6]

■ While it is well settled that a person who unintentionally causes a death by the grossly negligent operation of a motor vehicle may not be convicted of common law involuntary manslaughter,[7] it is equally well settled that a person who unintentionally causes a death as a result of that person's grossly negligent failure to perform a legal duty may be convicted of common law involuntary manslaughter. In *State v. Gibson*, 4 Md.App. 236, 242 A.2d 575 (1968), while affirming the dismissal of four "common law misdemeanor-manslaughter" charges based upon violations of the motor vehicle laws,[8] the Court of Special Appeals stated:

> Involuntary manslaughter at common law has been generally defined as the killing of another unintentionally and without malice (1) in doing some unlawful act not amounting to a felony, or (2) in negligently doing some act lawful in

**6.** The record shows that the debris field consisted of three sections. The first section was about 388 feet long, and had a heavy concentration of gravel. The second section, which was separated from the first section by about 220 feet, had a 130 foot span of less concentrated gravel. The third section, which was separated from the second section by about 70 feet, consisted of a light sprinkle of gravel. In a statement Respondent made to investigators, he claimed that he stopped at the end of the third section, surveyed the area, kicked some of the gravel off of the roadway, and continued onto the quarry, but was unable to see the entire debris field from the point at which he stopped. Four police officers testified that they saw the entire debris field from the same position. Two officers described the road as "snow covered." The approximate weight of the total gravel spilled was 3,480 pounds.

**7.** In *Forbes v. State*, 324 Md. 335, 597 A.2d 427 (1991), this Court reaffirmed "the holding in *State v. Gibson*, 254 Md. 399, 254 A.2d 691 (1969), affirming *State v. Gibson*, 4 Md.App. 236, 242 A.2d 575 (1968), that common law involuntary manslaughter does not encompass such conduct." *Id.* at 336, 597 A.2d at 428.

**8.** The charges at issue were counts of an indictment returned by a Baltimore County Grand Jury, charging that the defendant "did feloniously kill and slay" the deceased by (1) failing to obey a stop sign and grant the right of way to the deceased's vehicle, (2) recklessly operating his motor vehicle, (3) operating his motor vehicle under the influence of intoxicating liquors, and (4) consuming and possessing an alcoholic beverage on a public highway, in violation of the Baltimore County Code.

itself, or (3) by the negligent omission to perform a legal duty.

\* \* \*

It is well settled in this State that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, or by negligently failing to perform a legal duty (the second and third classes of involuntary manslaughter above delineated), the negligence necessary to support a conviction must be gross or criminal, *viz.,* such as manifests a wanton or reckless disregard of human life.

4 Md.App. at 242, 242 A.2d at 578–79. After granting the State's petition for writ of certiorari in that case, this Court "concluded that the result reached by the Court of Special Appeals was correct for the reasons given in the careful and thorough opinion of Chief Judge [Robert] Murphy of the Court, in *State v. Gibson,* 4 Md.App. 236 [242 A.2d 575], which we approve." *State v. Gibson,* 254 Md. 399, 401, 254 A.2d 691, 692 (1969). This Court has repeatedly included in the definition of involuntary manslaughter an unintentional death caused "by the negligent omission to perform a legal duty." *Dishman v. State,* 352 Md. 279, 291, 721 A.2d 699, 704 (1998); *State v. Albrecht,* 336 Md. 475, 499, 649 A.2d 336, 347 (1994); *Cox v. State,* 311 Md. 326, 331–32, 534 A.2d 1333, 1335–36 (1988).

■ To convict a defendant of involuntary manslaughter by grossly negligent failure to perform a legal duty, the State must prove beyond a reasonable doubt that (1) the victim's death was caused by the defendant's failure to perform a duty that the defendant had a legal obligation to perform, and (2) the defendant acted in a grossly negligent manner because the defendant (a) was aware of his or her obligation to perform that duty, and (b) was aware that his or her failure to perform that duty would create a high degree of risk to human life. *Dishman,* 352 Md. at 291, 721 A.2d at 704; *Albrecht,* 336 Md. at 499, 649 A.2d at 347; Judge Charles E. Moylan, Jr., *Criminal Homicide Law,* § 12.9 (2002); David E. Aaronson, *Maryland Criminal Jury Instructions and Commentary,*

§ 5.54(B) (3rd ed. 2009). In the case at bar, however, the crime of involuntary manslaughter by grossly negligent failure to perform a legal duty was not charged in the indictment.[9]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY HARFORD COUNTY.**

BELL, C.J., joins in judgment only.

---

**9.** The crime of involuntary manslaughter by grossly negligent failure to perform a legal duty is not a lesser-included offense of the crime of manslaughter by vehicle.