*State of Maryland v. Patrick Joseph Thomas a/k/a Patrick Joseph Patrick*, No. 33, September Term, 2018, Opinion by Adkins, J.

**CRIMINAL LAW – INVOLUNTARY MANSLAUGHTER – GROSS NEGLIGENCE –** *MALUM IN SE* **CRIMINAL OFFENSE**: An act can be the basis of a gross negligence involuntary manslaughter charge, regardless of whether it is a *malum in se* or *malum prohibitum* offense.  Under an unlawful act involuntary manslaughter theory involving a *malum in se* offense, a court presumes that the unlawful act is conducted with a culpable *mens rea*.  Inversely, when the State proceeds under a gross negligence involuntary manslaughter theory, it must demonstrate the grossly negligent *mens rea* beyond a reasonable doubt, notwithstanding the character of the offense.  The Court declined to opine whether the distribution of heroin is a *malum in se* or *malum prohibitum* offense.

**CRIMINAL LAW – INVOLUNTARY MANSLAUGHTER – GROSS NEGLIGENCE –** *MENS REA* **– DISTRIBUTION OF HEROIN**: Grossly negligent conduct must amount to a "wanton and reckless disregard for human life."  *State v. Albrecht*, 336 Md. 475, 499 (1994) (citation omitted).  In essence, this means that the individual's conduct must be a gross departure from the conduct of an ordinarily prudent person, occur without regard to the rights of others, and be "likely at any moment to bring harm to another," *Johnson v. State*, 213 Md. 527, 533 (1957) (citation omitted).  The underlying act of distribution of heroin is "inherently dangerous," in and of itself. *Commonwealth v. Catalina*, 556 N.E.2d 973, 980 (Mass. 1990) (citation omitted).  The circumstances surrounding this particular sale of heroin—including that the victim was desperate for heroin, the victim was a "young boy," the distributor had substantial experience with heroin, and the distributor neglected to take any mitigating measures— vault it into the grossly negligent category.  Thus, the evidence was sufficient for the trial court to hold that the distributor was grossly negligent.

**CRIMINAL LAW – INVOLUNTARY MANSLAUGHTER – GROSS NEGLIGENCE – PROXIMATE CAUSATION – DISTRIBUTION OF HEROIN**: "A causal connection between . . . gross negligence and death must exist to support a conviction . . . ."  *Albrecht*, 336 Md. at 499 (citation omitted).  This includes both actual and legal cause.  Maryland cases have reviewed actual cause in involuntary manslaughter cases like *Palmer v. State*, 223 Md. 341 (1960), and *Goldring v. State*, 103 Md. App. 728 (1995).  Here, the evidence was sufficient for the trial court to conclude that, but for the four bags of heroin, the victim would not have overdosed.  Additionally, it was reasonably foreseeable that the victim would ingest the heroin provided by the dealer.  Thus, ingestion of the heroin was the proximate cause of the victim's death.

IN THE COURT OF APPEALS

OF MARYLAND

No. 33

September Term, 2018

STATE OF MARYLAND

v.

PATRICK JOSEPH THOMAS A/K/A
PATRICK JOSEPH PATRICK

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty,
Adkins, Sally D.,
   (Senior Judge, Specially Assigned)

JJ.

Opinion by Adkins, J.
Greene, Hotten and Getty, JJ., dissent.

Filed: June 24, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The past twenty years have seen a dramatic increase in heroin use, abuse, and accessibility.[1] Unsurprisingly, Maryland has experienced a correlating spike in heroin and opioid-related deaths.[2] Our State, and Marylanders alike, seek tools to combat this epidemic. We are asked to consider under what circumstances the dangers of heroin would justify holding a dealer liable for involuntary manslaughter for supplying the means by which his customer fatally overdoses. The issue is fraught. The perception of an epidemic cannot solely dictate its legally recognized danger. As our role requires, we address the issue in the specific context of *this* sale of heroin to determine where the act falls on the continuum of culpability.

The question presented is at once straightforward and weighty: whether the evidence in the trial court was sufficient to sustain Patrick Joseph Thomas' ("Thomas") conviction for involuntary manslaughter.[3] We resolve this case in favor of Petitioner, holding that

---

[1] *Heroin Trafficking in the United States*, Cong. Research Serv. 1–3 (Feb. 14, 2019), https://fas.org/sgp/crs/misc/R44599.pdf [*archived at* https://perma.cc/YP3D-PWES].

[2] *Overdose Data and Reports*, Md. Dep't of Health, Behavioral Health Admin., https://bha.health.maryland.gov/OVERDOSE_PREVENTION/Pages/Data-and-Reports.aspx [*archived at* https://perma.cc/Y6JN-VXR2].

[3] We have rephrased and consolidated the questions presented for clarity. The issues as granted are as follows:

> 1) As a matter of first impression, may a seller of heroin be convicted of a murder-related offense where the buyer of the heroin dies after ingesting it?
>
> 2) Did CSA assume facts not in evidence and otherwise usurp the role of the fact-finder when it held that, as a matter of law, the State presented insufficient evidence of gross negligence

there was sufficient evidence to convict Thomas of gross negligence involuntary manslaughter.

## BACKGROUND

The State charged Thomas with three counts: distribution of heroin, reckless endangerment, and involuntary manslaughter. Thomas entered, what we have termed before, a "hybrid plea," wherein the parties "agree to the ultimate facts," while "maintain[ing] the ability to argue legal issues, as well as sufficiency." *Bishop v. State*, 417 Md. 1, 22 (2010). "The State's proffer may not contain disputes of material fact, because the judge cannot resolve credibility issues on a mere proffer." *Id.* at 24. These agreed factual findings were read into the record by the State's Attorney and are quoted at length below.

As an initial matter, Thomas objects to the State's citation of "at least ten journal articles, newspaper reports, and internet websites" to support its argument, because, he asserts, we are confined to the record "as presented to the lower court." Moreover, Thomas states that he "does not agree to the facts identified by the State" in its brief, particularly considering that they are not placed in the context of the time in which this incident occurred, 2015.

We agree with Thomas that newspaper articles—excepting those referenced in the agreed statement of facts—play no role in consideration of this case. Still, this Court is able to take judicial notice of facts "not subject to reasonable dispute" and "capable of

and causation to sustain Respondent's manslaughter conviction?

2

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Maryland Rule 5-201(b). We may take such notice on request or *sua sponte*, *see id.* 5-201(c), regarding a range of reliable scientific and historical data. *See, e.g.*, *Faya v. Almaraz*, 329 Md. 435, 445 (1993) (Surgeon General's Reports issued by the U.S. Department of Health and Human Services); *B.N. v. K.K.*, 312 Md. 135, 139–40 (1988) (reports issued by the Centers for Disease Control and Prevention, as well as other academic publications); *Gillespie-Linton v. Miles*, 58 Md. App. 484, 499 (1984) (life expectancy tables).

**Agreed Findings of Fact[4]**

[O]n June 26th of 2015, at approximately 3:19 in the morning, Worcester Central received a 911 call from Tammy Colleen Matrey [("Tammy")], who resides . . . [in] Ocean Pines, Worcester County, Maryland. Tammy advised that she had located her son, Colton Lee Matrey [("Colton")], locked in her bathroom. Colton was unresponsive, had no pulse and was not breathing. Tammy would testify that she had previously seen Colton earlier that day, alive and well, and had found him at this particular time of evening or early morning hours of the 26th of June unresponsive.

At 3:27 in the morning Ocean Pines Emergency Medical Services and Ocean Pines Police Officer Kerrigan arrived at the residence and located Colton seated on the toilet in the bathroom with his head propped on the vanity top. They pronounced Colton deceased. Because of the scene, it was determined that Colton died of a probable heroin overdose. And, therefore, the Worcester County Criminal Enforcement Team was contacted and asked to respond to conduct a criminal investigation of the circumstances surrounding Colton's death.

---

[4] For ease of reading, name substitutions and quotation marks have been inserted without brackets or any other indication. All other alterations to the agreed statement of facts are set off by brackets. Asterisks denote the removal of paragraphs.

At approximately 4:30 in the morning, Detective Jeff Johns [("Johns")] of the Ocean City Police Department, assigned to the Worcester County Criminal Enforcement Team, arrived at the residence. Without objection, Johns would have been offered and accepted as an expert in the valuation and identification of controlled dangerous substances [("CDS")], the common practices of users and dealers of [CDS] and [CDS] investigations generally.

Johns arrived at the residence, went into the bathroom of the residence, observed Colton, determined that Colton's body had not been moved. . . .

Johns located one white wax paper bag inside of Colton's right hand. There were three additional identical white wax paper bags on the ground directly beneath Colton between the toilet and the vanity. Each one of these bags was stamped ["banshee"] in blue, with a blue-colored emblem. Those packages contained trace amounts of suspected contraband [and] are what Johns knows is commonly used to contain heroin.

* * *

[State's exhibits] reflect the photograph of Colton's right hand which contained the one empty package of banshee and the other photograph depicts what was found in Colton's pants pocket, which was a syringe.

* * *

Colton's bedroom was searched with the consent of his mother. And located in Colton's bedroom were four additional hypodermic syringes, a spoon and a Q-tip inside of a folded pair of Colton's jeans in the closet. These were identified by Johns as heroin paraphernalia. There was also a prescription pill bottle with the label torn off that contained six 50-milligram tramadol pills, which is a Schedule IV [CDS]. It was determined that Colton did not have a prescription for the tramadol pills and possibly had taken these pills, unknowingly, from his mother.

* * *

Johns spoke with the individuals who were present in the residence at the time [of Colton's death]. In addition to Tammy, . . . there was also James Godino [("Godino")], who

4

was the boyfriend of Tammy, and Carissa Koons [("Koons")], who was the girlfriend of Colton.

It was determined . . . by interrogating or questioning those three individuals that Colton had been abusing heroin for approximately four[-]and[-]a[-]half years. He resided in Pennsylvania up until February of 2015, when he moved to Ocean Pines, Maryland to live with his mother. . . .

Koons had been in a relationship with Colton for four years. She advised that Colton had always had a heroin addiction. Approximately two[-]and[-]a[-]half years ago Colton had overdosed after being released from a halfway house where he had become clean of opiates. Narcan, or naloxone, was administered, and he had survived that overdose. However, Koons advised that he continued to abuse heroin after that overdose.

In February of 2015[,] Colton moved out of the Pennsylvania area and into his mother's home in an attempt to isolate himself from the lifestyle of heroin abuse in Pennsylvania. . . .

[O]n June 25th[,] Colton had asked his mother to borrow her debit card. Tammy allowed Colton to have her debit card so that he could rent a couple of movies.

After his death, she checked her bank transactions. She observed that Colton had rented two movies and then withdrew $40 in U.S. currency. This $40 in U.S. currency was withdrawn at 11:59 in the evening on the 25th of June . . . .

On June 25th of 2015[,] at approximately 11:50[,] Koons woke up from her sleep and observed that Colton had her car keys. . . . He then left the residence. . . .

Approximately five minutes after Colton left the residence, Koons called Colton. He did not answer. She woke up at approximately [1:00] in the morning, noticed that Colton was not in the bedroom with her and called him again. He did not answer, and she fell back asleep.

At approximately 3:10 to 3:15 in the morning[,] Koons woke up again. Colton was still not back in the bedroom. She then checked the bathroom and noticed that the door was locked, looked under the door crack and observed Colton's shoes. She then woke up Colton's mother, Tammy, and Godino. Godino removed the door hinges, at which time they were able to locate Colton's body in the bathroom. He was checked for a pulse. It was determined that he was not breathing and that's when 911 had been called.

Johns, as part of the investigation, seized Colton's black in color cellular telephone. . . . Tammy granted Johns permission to search the contents of the phone in an attempt to identify Colton's supplier of heroin. . . .

Later in the day[,] Tammy contacted Johns and advised that she had found a piece of paper inside Colton's wallet that had two names and phone numbers written down. . . .

The names and numbers written down on this piece of paper was [*sic*] the name Pat, with the number . . . , and also the name G – G . . . and his number . . . .

Johns, utilizing the LInX Law Enforcement database, input the number that corresponded with the name of Pat. The database search identified Patrick Joseph Thomas [("Thomas")], with a date of birth of 8/16/56, a 58—at the time—year old white male as the owner of the phone.

* * *

[Koons] indicated [to Johns] that when she woke up at approximately 11:50 on June 25th of 2015, and Colton was still in the house, she heard Colton complaining that Pat was not answering the phone. This was right before Colton left the residence in Koon's car. There was no real familiarity with Pat. Koons had never met Pat.

* * *

A physical examination of Colton's phone . . . shows that an individual by the name of Pat was saved as one of his contacts. And the phone number . . . corresponded with the number found in Colton's wallet.

6

Johns then looked through the . . . call log on Colton's phone and observed the following: On June 25, 2015, starting at 11:45 in the evening, [23:45] hours, Colton called Thomas 27 times . . . between 11:45 and 12:07 a.m. All of those call durations, except for the last one, were zero seconds, indicating no answer, no contact. That last call was 27 seconds long, indicating contact.

Additionally, there were text messages sent from Colton's cellular telephone sent to the number associated with Thomas. Those text messages were sent on June 25, 2015, at [23:46] hours, which stated, "I got $30, man, call me, please." June 25, 2015, at [23:48] hours, "Call me." June 25, 2015, [23:48], "I'll come to you." June 26, 2015, at two minutes past midnight, . . . "I'm here, I need 4." . . . June 26, 2015, at [00:05] hours, "Yo, I'm here."

Johns would testify, based on his training, knowledge, and experience . . . that these were outgoing cell phone calls and text messages reaching out to Thomas, inquiring about purchasing five[5] [*sic*] bags of heroin during those several minutes. . . .

[F]rom Colton's last communication until the time he's pronounced dead, the only person he attempted to communicate with was Thomas.

Based on that information, a search and seizure warrant was authored by Johns. And on July 2nd of 2015, a search and seizure warrant was executed on the person of Thomas and [his residence.]

* * *

Johns located a total of 60 individual white wax paper bags. These bags were stamped ["banshee"] in blue, with a blue emblem. These bags were identical in appearance to the bags recovered from Colton from the date that he expired. These bags were on a table that was directly next to the chair where Thomas was seated during the warrant execution.

---

[5] All other information in the agreed statement of facts and the parties' briefs suggests that this number should be "four." Thus, we presume this statement was in error.

Each of these bags contained a light brown powdery substance that was suspected heroin. . . . [E]ight bags were loose on the table, and there were another 52 bags that were packaged in four bundles.

* * *

There were several hundred empty . . . wax paper bags[] on the floor directly next to the chair where Thomas was seated and on the table next to Thomas. . . . Johns noticed a combination of the following: . . . wax paper bag[s] stamped "banshee" in blue with a blue emblem[;] . . . white wax paper bags stamped "banshee" in blue with no emblem[;] . . . white wax paper bags stamped "New York" in black with a black mask emblem[;] . . . blue wax paper bags stamped "Gucci" in red with a red emblem[;] . . . [and] blue wax paper bags stamped "slam" . . . in red with no emblem.

* * *

Also seized from Thomas was an LG brand cellular telephone that was on the table next to where he was seated.

* * *

[Johns examined Thomas' phone.] [A] screen shot of the LG phone . . . identified as Thomas' identif[ied] an individual logged . . . as a contact. The name is "Colton". . . . [The number] corresponds with Colton's cellular telephone.

* * *

Toll records show that the cellular telephone that was in Thomas' possession received 28 incoming phone calls from Colton's phone number, starting as [23:45] hours, or 11:45, on the evening of June 25th of 2015, and continued through seven minutes after midnight on June 26th of 2015. . . .

Johns would testify that the inconsistency, meaning there was 27 versus 28 [calls], would be that one of those calls would have been deleted by Colton accidentally.

* * *

The 60 bags recovered from Thomas' residence [were] . . . submitted . . . for testing and analysis. . . . [T]hat report reflects that the gross weight was 13.10 grams. . . . Five specimens were analyzed separately, resulting in the conclusion that those items contained the substance of heroin, a Schedule I [CDS].

* * *

[H]ad this matter gone to trial, . . . the State would have introduced the postmortem examination of the Office of the Chief Medical Examiner. . . . [The] autopsy [was] performed by [Theodore M. King, M.D. ("King")]. . . . [T]he toxicology report and findings [stated:]

"This 23-year-old white male, Colton Lee Matrey, died of alcohol and narcotic (free morphine) intoxication. The manner of death could not be determined. Autopsy detected increased levels of alcohol and a drug (free morphine) in the heart blood of the deceased and also showed evidence of heart disease and injuries to the head, neck, back, upper extremities and lower extremities. The additional finding in the prostate gland was incidental to the man's death. The deceased had been consuming alcoholic beverages and heroin (a drug) a [*sic*] prior to death. Post mortem testing for additional drugs was negative."

* * *

During Johns' testimony, . . . inquiry would have been made regarding the general public awareness regarding the dangers of heroin. It would be his testimony that Worcester County, this particular region, and the State of Maryland has been consumed with heroin overdoses, some resulting in deaths, and that these overdoses have resulted in an acute awareness of the dangers of heroin. Simply put, he would say, heroin kills, and everyone knows it.

* * *

He would also testify that even . . . outside of the drug use or abuse realm, it is still commonly known. He would testify that one local paper is currently running a weekly series of articles regarding the dangers of heroin use . . . . He would testify that the community itself has come together and formed groups in order to address the opioid and heroin problems facing this particular community.[6] It would be his

---

[6] "Heroin is an opioid drug made from morphine, a natural substance taken from the seed pod of the various opium poppy plants . . . ." *Heroin*, Nat. Inst. on Drug Abuse (June 2018), https://www.drugabuse.gov/publications/drugfacts/heroin [*archived at* https://perma.cc/L2AK-S7NT]. The term "opioid" is an umbrella term including all "prescription medications used to treat pain such as morphine, codeine, methadone, oxycodone, hydrocodone, fentanyl, hydromorphone, and buprenorphine, as well as illegal

testimony . . . that anyone in Thomas' situation would understand the dangers of heroin, and its propensity to harm physically, if not kill, individuals who are ingesting it.

Following Thomas' arrest, he was transported to the Worcester County Sheriff's Office. . . . Corporal Wells [("Wells")] and [other officers] . . . met with Thomas at the sheriff's office in the processing room. Wells advised Thomas of his *Miranda* rights . . . . [T]here is no argument as to the voluntariness of [Thomas'] statement.

\* \* \*

Wells asked Thomas, "How many bags of heroin do you use a day?" Thomas replied, "About 12." Wells asked Thomas, "How many bags do you use in a single shot?" Thomas replied, "Four."

Wells advised Thomas that investigators were aware that he was travelling to Delaware to get his supply of heroin. Wells asked Thomas, "How often do you go to Delaware to get heroin?" Thomas replied, "Every two to three days." Wells asked Thomas, "How many bundles do you get at a time?" Thomas replied, "Five." Wells asked Thomas, "How much . . . did you pay today for the five bundles?" Thomas replied, "Three hundred dollars."

A bundle . . . would be testified by Johns as [being] . . . anywhere from ten to thirteen . . . individual bags of heroin. They are rubber-banded together and sold as a bundle. . . .

Wells asked Thomas, "When did you last go to Delaware to get heroin?" Thomas replied, "Today." . . . Wells asked Thomas, "How much do you sell a bag of heroin for?" Thomas replied, "Ten to fifteen dollars." Wells asked Thomas, "So out of the five bundles you got today, how many bags would you normally sell?" Thomas replied, "About 30."

---

drugs such as heroin and illicit potent opioids such as fentanyl analogs (e.g., carfentanil)." *Opioid Overdose Prevention Toolkit*, Substance Abuse & Mental Health Servs. Admin. 1 (June 2018), https://store.samhsa.gov/system/files/sma18-4742.pdf [*archived at* https://perma.cc/R3CZ-YZJZ].

Wells asked Thomas, "What is the best heroin out there now?" Thomas replied, "Banshee." Wells asked Thomas, "How long have you been selling the banshee bags?" Thomas replied, "A month or a month and a half."

Wells advised Thomas, "We saw you sell some heroin to a boy named Colton, or something like that, the other week." Thomas replied, "Yeah, you mean Colt." Wells asked Thomas, "What do you know about Colt?" Thomas replied, "He is a young boy. He told me he did some prison time in Pennsylvania." Wells asked Thomas, "How many times have you sold heroin to Colt?" Thomas advised, "A few times."

Wells told Thomas, "When we saw you sell to Colt, it was like midnight. Do you remember that?" Thomas replied, "Yeah, it was late." Wells asked Thomas, "Is that what time you normally meet with Colt?" Thomas replied, "No, that was weird. I usually met him earlier." Wells asked Thomas, "So that was the only time you sold heroin to Colt at around midnight?" Thomas replied, "Yeah." Wells advised Thomas, "Do you remember how many bags you sold him?" Thomas replied, "Four."

\* \* \*

Wells asked Thomas, "Where did you meet with Colt on this night?" Thomas replied, "I can't remember where I met him. It could have been the Food Lion parking lot. No, I think I met him on the street in Ocean Pines." Wells asked Thomas, "Was Colt driving a car?" Thomas replied, "No, he was walking." Wells asked Thomas, "What kind of bag did you sell Colt?" Thomas replied, "Banshee bags."

Wells then showed Thomas a photograph taken of Colton. This photograph depicted Colton deceased in the bathroom of Colton's mother's house. Wells asked Thomas, "Is this the person you know as Colt?" Thomas looked at the photograph and replied, "Yeah, that's him."

Thomas has a puzzled look on his face. Thomas asked Wells, "Is he dead in that picture?" Wells replied, "Yes. This picture was . . . taken just hours after [Colton] met with you and bought heroin." Thomas replied, "He couldn't have overdosed off what I sold him. I only sold him four bags."

11

Wells then showed Thomas a picture of four banshee bags of heroin that were recovered from the bathroom that Colton was found deceased in. Wells asked Thomas, "You mean these four bags?" Thomas' eyes opened widely.

\* \* \*

Wells asked Thomas, "Do you know how old Colt was?" Thomas replied, "I think he was like 19."[7] Wells and Thomas sat quietly for a moment. Wells asked Thomas, "What do you think?" Thomas said, "I feel bad." Detective Trader [("Trader")] advised Thomas, "You got to live with this on your conscience." Thomas replied, "I know." . . .

Trader then began walking Thomas to a holding cell. . . . Thomas stated to Trader that he felt bad about Colt's death. Trader advised, "Who wouldn't?" And Thomas replied, "Someone without a conscience."

\* \* \*

By agreement, if this case were to go to trial, Thomas would testify . . . and his testimony would include the fact that he personally had used the same product, the banshee heroin, [prior to Colton's use,] and had not overdosed and, obviously, had not died from his use of it.

**Procedural Posture**

The trial court found Thomas guilty of distribution of heroin, reckless endangerment, and involuntary manslaughter. The State presented two possible theories for an involuntary manslaughter conviction: unlawful act manslaughter and gross negligence manslaughter. The court determined that Thomas could be convicted under either theory. Specifically, the judge concluded that Thomas was grossly negligent because the testimony would have shown that "it is well known that, in fact, the use of heroin can cause death," and Thomas' statement to police demonstrated that he was so aware.

---

[7] In fact, Colton Matrey was 23 at the time of his death.

12

Alternatively, the judge stated that he reached the same result under an unlawful act analysis.

Thomas appealed the trial court's ruling to the Court of Special Appeals, challenging the sufficiency of the evidence to sustain his involuntary manslaughter conviction. *Thomas v. State*, 237 Md. App. 527, 531 (2018). The intermediate appellate court first held that the State failed to establish causation sufficient to convict Thomas of unlawful act manslaughter. *Id.* at 535–36. The State does not challenge this determination and we do not review it. Addressing gross negligence manslaughter, the Court concluded that "the State failed to carry its burden of proof in two regards." *Id.* at 536. First, it held that, though there might be evidence of negligence, there was not sufficient evidence of gross negligence. *See id.* at 537. Additionally, the intermediate appellate court held that the defendant must be the "but for" cause of the victim's death, but "the causal chain was broken." *Id.* The State appeals to this Court.

## DISCUSSION

### Standard of Review

The trial court convicted Thomas of manslaughter under both an unlawful act and gross negligence theory. It is our task only to review that court's determination for whether there was sufficient evidence in the record to support it. While it is typically cautioned that we must not "undertake a review of the record that would amount to, in essence, a retrial of the case," *State v. Albrecht*, 336 Md. 475, 478 (1994), there was no "trial" in the present case in the traditional sense. Rather, this case proceeded on an agreed statement of facts. So, like the trial court, we accept the parties' agreed "ultimate facts" and "simply appl[y]

13

the law to the facts agreed upon[.]" *Taylor v. State*, 388 Md. 385, 396–97 (2005) (citation omitted). We ask only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Albrecht*, 336 Md. at 479 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)).

**Gross Negligence Involuntary Manslaughter**

In Maryland, involuntary manslaughter is a common law felony, though punishments are doled out in accordance with Maryland Code (2002, 2012 Repl. Vol.), § 2-207(a) of the Criminal Law Article ("CR"). Involuntary manslaughter is the unintentional killing of a human being, irrespective of malice. *See Albrecht*, 336 Md. at 499. There are generally thought to be three varieties of involuntary manslaughter: (1) unlawful act manslaughter—"doing some unlawful act endangering life but which does not amount to a felony"; (2) gross negligence manslaughter—"negligently doing some act lawful in itself"; and (3) "the negligent omission to perform a legal duty." *Id.* (citations omitted). For the latter two categories of involuntary manslaughter, "the negligence [must] be criminally culpable"—i.e., grossly negligent. *Mills v. State*, 13 Md. App. 196, 200 (1971). The present case involves only the second variety: gross negligence involuntary manslaughter.

The State must also demonstrate a "causal connection between such gross negligence and death . . . to support a conviction, although it is not essential that the ultimate harm which resulted was foreseen or intended." *Albrecht*, 336 Md. at 499 (citation omitted). This includes actual, but-for causation and legal causation. The legal cause

14

analysis "turns largely upon the foreseeability of the consequence" of the defendant's acts or omissions and whether "the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant." *Palmer v. State*, 223 Md. 341, 352–53 (1960) (citation omitted).

The State has made clear that its "sole argument before this Court is that the evidence was sufficient to convict Thomas of grossly negligent involuntary manslaughter." Consequently, we do not review the Court of Special Appeals' determination regarding unlawful act involuntary manslaughter. Instead, we focus only upon whether the evidence introduced in the trial court was sufficient to convict Thomas of gross negligence involuntary manslaughter—in other words, to vault Thomas' conduct over the theoretical bar separating ordinary negligence from criminal gross negligence.

### The Gross Negligence Standard

As Judge Charles Moylan, a venerated scholar of Maryland criminal law, explained, "[f]rom the beginning, the Maryland caselaw describing the 'gross negligence' necessary to support a conviction for involuntary manslaughter equated 'gross negligence' with a 'wanton or reckless disregard for human life.'" Charles E. Moylan, Jr., *Criminal Homicide Law* § 12.4, at 226 (2018); *see also Albrecht*, 336 Md. at 499 (citation omitted). There is no obvious or empirical definition of "wanton and reckless disregard for human life," but our cases have attempted to describe the "feel" of it. *See Pagotto v. State*, 127 Md. App. 271, 280 n.2 (1999), *aff'd*, 361 Md. 528 (2000) ("As a practical matter, jurors and judges alike are frequently able to 'sense' or to 'feel' the difference between depraved-heart murder and gross-negligence manslaughter," as opposed to define it).

15

In general, the "gross negligence" *mens rea* is established by asking "whether the accused's conduct, 'under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others . . . .'" *Albrecht*, 336 Md. at 500 (citation omitted). The defendant must commit an act "so heedless and incautious as necessarily to be deemed unlawful and wanton . . . ." *Id.* (citation omitted). The act must "manifest[] such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of indifference to the consequences." *Id.* (citation omitted). Moreover, the defendant, or an ordinarily prudent person under similar circumstances, should be conscious of this risk. *See id. See also Dishman v. State*, 352 Md. 279, 299 (1998); Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 107 (3d ed. 1982). Still, these definitions, while somewhat descriptive, are of limited practical use.

It is difficult to draw an exact line dividing gross negligence from the lower ordinary negligence standard, or from the higher depraved-heart standard. Although, as recognized by Judge Moylan, these *mentes reae* exist one-after-the-other on a continuum of culpability. *See* Moylan, *Criminal Homicide Law* § 12.3, at 225. The definitional difficulty lies in the fact that culpability, by its nature, is dependent on the observable forces at play in a given scenario. Our courts have discussed gross negligence involuntary manslaughter in four main contexts: automobiles, police officers, failure to perform a duty, and weapons. None of these provide a perfect analogue for heroin distribution, but, together, they create a helpful tableau depicting how we assess a defendant's level of negligence. We review the most impactful of these cases below.

16

In 1941, the General Assembly enacted a law specifically defining "manslaughter by vehicle" as causing the death of another by "driving, operating, or controlling a vehicle . . . in a grossly negligent manner." CR § 2-209(b). Although this statute preempts any prosecution for such conduct as common law gross negligence manslaughter, *see State v. DiGennaro*, 415 Md. 551, 565 (2010), we have stated that it involves precisely the same "common law concept and meaning of gross negligence," *Duren v. State*, 203 Md. 584, 588 (1954) (citation omitted). Thus, these cases are still relevant here.

*Duren v. State* may provide a useful low-water mark for successful manslaughter by vehicle prosecutions. The defendant, driving in a "heavily congested residential and business area" of Baltimore City, drove his car at 7:00 p.m. on a Sunday in December at a speed of at least 60 miles per hour, approximately 30 miles per hour over the speed limit. *Id.* at 588–89. Ultimately, he struck a pedestrian who had entered the street between two parked cars, hurling him onto the trunk of a nearby car and killing him. *See id.* at 589. The Court found it significant that the car hit the victim with such force even after the defendant had apparently attempted to brake, leaving skid marks for 72–89 feet. *See id.*

Concluding that the evidence was sufficient to convict the defendant of manslaughter by vehicle, the Court reasoned it was "plain that the environment in which speed is indulged must determine whether it does or does not show gross negligence at a given time." *Id.* at 591. What must be observed is "a lessening of the control of the vehicle to the point where such lack of effective control is likely at any moment to bring harm to another." *Id.* at 592. Here, the Court could not say the trial court was "clearly wrong" when it found the defendant's speed, in the context of his environment, amounted to gross

17

negligence, or "a disregard of the consequences which might ensue and indifference to the rights of others, and so was a wanton and reckless disregard for human life." *Id.* at 590.

*Duren* was not an outlier. In *State v. Kramer*, 318 Md. 576, 586–89 (1990), we again found evidence sufficient to support a conviction for manslaughter by automobile when a driver in a rural area, passing in a no-pass zone going at least 75 miles per hour, hit an oncoming vehicle—all the while talking and joking with his passengers.[8] We summed up the holding as follows:

> [T]he jury, weighing the speed in the light of the surrounding circumstances, could, again in the words of *Duren,* have found "such a lack of control, whether by reason of speed or otherwise, in a place and at a time when there [was] constant potentiality of injury as a result . . . ." In addition to speed and lack of control, the factor of lack of attention was present. In his brief, Kramer concedes that it could be inferred from the evidence that Kramer "failed to keep a proper lookout and thus came upon the Lee vehicle so suddenly that he had to swerve to avoid it." Thus, the evidence was legally sufficient for the jury to find on Kramer's part a wanton and reckless disregard of the rights and lives of others and so a state of mind amounting to criminal indifference to consequences.

*Id.* at 592–93.

In a similar case with a divergent outcome, *Johnson v. State*, 213 Md. 527, 530 (1957), the Court reviewed a scenario in which a passenger was ejected from the defendant's car and killed. The defendant, driving in a non-residential portion of Baltimore City at 1:50 a.m., hit a curb, side-swiped a pole, and ended up in a plot of grass. *See id.* at

---

[8] The conviction for manslaughter by automobile was reversed only because of the prejudicial joinder of that charge with an insurance violation charge. *See State v. Kramer*, 318 Md. 576, 593 (1990).

529–30.  A witness testified that the defendant's car was going 60 miles per hour, but her testimony was severely undercut during cross-examination, and the defendant testified he was traveling at 35 miles per hour.  *See id.* at 530.  He had consumed two beers and officers smelled alcohol on his breath but did not believe that he was intoxicated.  *See id.*

The central issue was "whether or not, in the circumstances existing at the time and place of the accident, the defendant was operating the automobile at such an excessive rate of speed as to constitute gross negligence within the meaning of [the statute]."  *Id.* at 531.  The Court focused, again, on "whether, by reason of the speed in the environment, there was a lessening of the control of the vehicle to the point where such lack of effective control is likely at any moment to bring harm to another."  *Id.* at 532–33 (citation omitted).  Contrasting the case with *Duren*, the Court looked to environmental factors like the type of road traveled, the time of day, the traffic, the density and character of the neighborhood, and any safety precautions or warnings disregarded.  *See id.* at 533.  Based on these factors, it determined that there was insufficient evidence to conclude that the defendant was grossly negligent.  *See id.* at 534.

These cases turn on whether, as judged by a holistic view of the risk factors at play, the defendant's conduct was "likely at any moment to bring harm to another."  While any one factor alone might not be enough to constitute gross negligence, the convergence of multiple factors creates an unacceptable threat of harm to others—with an emphasis on the one most likely to kill: speed—making an inference of wanton and reckless disregard for human life permissible.  *Compare Goldring v. State*, 103 Md. App. 728, 734 (1995) ("[T]here was ample evidence to support a rational finding that appellant's decision to

compete in a drag race on Sunny Side Road constituted grossly negligent conduct."), *with Thomas v. State*, 206 Md. 49, 56–58 (1954) (where the driver consumed alcohol and drove a truck with brakes in need of repair, there was no gross negligence without evidence of speeding). *See also Plummer v. State*, 118 Md. App. 244, 267 (1997) (noting the absence of alcohol or speed in overturning a manslaughter by vehicle conviction).

Common law gross negligence involuntary manslaughter also appears in cases involving negligent police officer conduct resulting in death. Importantly, such cases are evaluated under a heightened "reasonable police officer under the circumstances" standard, rather than a reasonably prudent person standard. *Albrecht*, 336 Md. at 487. Still, they provide further guidance concerning the line between ordinary and gross negligence.

In *State v. Albrecht*, 336 Md. at 479, two officers responded to a report of the stabbing of a man with a broken bottle. One of the men involved in the stabbing, "Budd," was reported to have fled the scene in a car driven by Rebecca Garnett ("Garnett"). *See id.* The officers pursued the car and discovered it parked at a townhouse complex, with Budd and Garnett standing outside the vehicle. *See id.* at 480. Officer Albrecht yelled to the suspects, removed a shotgun fitted with a bandolier from his police cruiser, "racked" the gun, and "leveled" it at Garnett. *Id.* at 481. Albrecht, with his finger on the trigger, testified that he "intended to swing the shotgun to the left" to aim it at another party, but the gun discharged, striking Garnett, who fell to the ground dead. *Id.* at 481–82. Albrecht, who claimed not to realize the gun discharged, continued yelling "I told you not to move" and racked a second round. *Id.* at 482. Albrecht testified that he did not believe that Garnett posed a danger to him or others, another officer at the scene stated that Garnett had done

20

nothing to warrant the shotgun being leveled at her, and an expert testified that officers are trained to keep their finger on the trigger guard, never the trigger. *See id.* at 504. Albrecht's conviction for grossly negligent involuntary manslaughter was upheld.

*State v. Pagotto*, 361 Md. 528, 533 (2000), similarly dealt with an officer-involved shooting resulting in the death of an individual, but, this time, the Court affirmed the intermediate appellate court's reversal of the officer's conviction. The Court identified five factors distinguishing *Pagotto* from *Albrecht*: (1) Albrecht drew a shotgun, racked it, and fitted it with a bandolier making it unbalanced; (2) Albrecht purposefully brought his gun to bear on the victim; (3) Albrecht placed his finger on the trigger of the gun, which is nearly universally prohibited; (4) Albrecht had ascertained that the victim was not armed and did not present a threat; and (5) several adults and children were behind Garnett when Albrecht shot her. *See id.* at 554–55.

These distinguishing factors are not unlike those provided in *Duren* and *Johnson*, above. Though not phrased this way in the opinions, Albrecht's conduct created a situation "likely at any moment to bring harm to another," whereas Pagotto's conduct—as judged by a reasonable officer standard—was not as unwarranted, unsafe, or likely to cause injury or death. These environmental risk factors "elevated Albrecht's behavior from ordinary civil negligence to gross criminal negligence." *Id.* at 554.

Finally, *Mills v. State*, 13 Md. App. 196 (1971), provides perhaps the easiest comparison to the present case as it is a pure question of gross negligence involuntary manslaughter. In this case, a 16-year-old boy took his father's gun with him to a school dance. *See id.* at 197. Unfamiliar with the operation of the weapon, the boy and his friends

went to the bathroom to look at the gun and drink liquor. *See id.* Knowing there was one bullet in the chamber, the boy pointed the gun at his friend, who slapped the gun from the boy's hand. *See id.* at 199. The gun hit the floor, discharged, and struck and killed another boy. *See id.* The Court of Special Appeals reasoned that the circumstances "plainly" demonstrated "a grossly negligent act dangerous to life . . . ." *Id.* at 202. Moreover, the friend's "reaction when the gun was pointed in his direction was wholly predictable," and therefore not an independent supervening cause. *Id.*

Significantly, in each of the above-enumerated cases, there is no scientific test or quantifiable probability of death that converts ordinary negligence to criminal gross negligence. Rather, the inherent dangerousness of the act engaged in, as judged by a reasonable person—or reasonable officer—is combined with environmental risk factors, which, together, make the particular activity more or less "likely at any moment to bring harm to another." *Johnson*, 213 Md. at 533. For example, while bringing a gun to a school dance might be negligent, the additional facts that the individual had little experience with weapons, was drinking, and pointed it jokingly at another surmount the gross negligence bar. This objective reading of the conduct and circumstances determines whether an act is grossly negligent and creates a permissible inference of wanton and reckless disregard for human life.

Another analogue useful in defining the requisite conduct required for gross negligence involuntary manslaughter is the crime of depraved-heart murder. We again turn to Judge Moylan, who noted that "gross negligence manslaughter is the junior varsity manifestation of depraved-heart murder." Moylan, *Criminal Homicide Law* § 12.1, at 223.

The *actus reus*—the killing—is identical, and the *mens rea*—the negligence—differs only as a matter of degree. Again, there is no "precise line" between the two offenses. *Dishman v. State*, 352 Md. 279, 299 (1998). Yet, it suffices to say that gross negligence manslaughter "involve[s] quantitatively less culpability in the first instance" than does depraved-heart murder. Moylan, *Criminal Homicide Law* § 12.2, at 224. In other words, it is "simply a little less wanton and a little less depraved . . . ." *Id.*

The *Maryland Pattern Criminal Jury Instructions* distinguish the two offenses, describing second-degree depraved-heart murder as involving one whose conduct amounts to "extreme disregard" and a "very high degree of risk" to human life. § 4:17.8, at 699 (2018). The pattern instructions describe gross negligence involuntary manslaughter as consisting of "reckless disregard" and a "high degree of risk" to human life. *Id.* § 4:17.9, at 704. Although the difference between "extreme" versus "reckless" disregard, and "very high" versus "high" risk, may seem amorphous, the circumstances in which the distinctions are relevant work to give them shape. *See Alston v. State*, 339 Md. 306, 320–21 (1995) (defendant was liable for depraved-heart murder where he "engage[d] in urban warfare" in a residential neighborhood, resulting in the death of bystanders); *In re: Eric F.*, 116 Md. App. 509, 521 (1997) (defendant could be convicted of depraved-heart murder where he "plac[ed] [the victim] outside in the cold, dragg[ed] her to the woods, and [left] her there in an unconscious state" to die).

In sum, when determining whether an individual has acted with the requisite grossly negligent *mens rea* to be found guilty of involuntary manslaughter, the State must demonstrate wanton and reckless disregard for human life. This requires a gross departure

from the conduct of an "ordinarily careful and prudent person" and a disregard or indifference to the rights of others. *Albrecht*, 336 Md. at 500 (citation omitted). It also involves an assessment of whether an activity is more or less "likely at any moment to bring harm to another," *Johnson*, 213 Md. at 532–33, as determined by weighing the inherent dangerousness of the act and environmental risk factors. This weighing must amount to a "high degree of risk to human life"—falling somewhere between the unreasonable risk of ordinary negligence and the very high degree of risk necessary for depraved-heart murder. *See Dishman*, 352 Md. at 299 (citation omitted). We review whether Thomas' conduct crosses this bar, *infra*.

### *Thomas' Involuntary Manslaughter Conviction*

The matter of whether distribution of heroin can be the basis of a gross negligence involuntary manslaughter conviction is one of first impression in Maryland. To address it, we rely on the principles enumerated above, as well as relevant out-of-state case law, to determine whether sufficient evidence exists in the record to permit the trier of fact to conclude that Thomas was grossly negligent and that his conduct caused Colton's death. But first, we address Thomas' curious contention that a conviction for gross negligence manslaughter cannot be premised upon the commission of a *malum in se* criminal act.

### *(i) Gross Negligence Manslaughter and* Malum in Se *Offenses*

Thomas proposes that Maryland should not recognize gross negligence manslaughter when the defendant is accused of committing a *malum in se* offense,[9] as

---

[9] *Malum in se* is defined as a "crime or an act that is inherently immoral, such as murder, arson, or rape." Malum in Se, *Black's Law Dictionary* (10th ed. 2014).

opposed to a *malum prohibitum* offense.[10]  Distribution of heroin, says Thomas, is a *malum in se* offense and, consequently, may only be tried under the unlawful act theory of manslaughter.  Thomas contends that allowing *malum in se* crimes to be charged as gross negligence manslaughter "hybridizes" the two involuntary manslaughter crimes, making them easier to prove.  In other words, Thomas argues that charging *malum in se* crimes as gross negligence manslaughter allows the State to take advantage of the less stringent causation showing of gross negligence manslaughter, while benefiting from the higher culpability presumed in a *malum in se* offense.

The State disagrees, providing that "whether distribution of heroin is a *malum in se* or *malum prohibitum* only matters if the State is proceeding on the unlawful act variety of involuntary manslaughter," which it is not.  Whenever a party is charged with gross negligence manslaughter, according to the State, the prosecution must prove that the act was grossly negligent, regardless of whether the crime at issue is *malum in se* or *malum prohibitum*.  Moreover, the State characterizes Thomas' argument as "nonsensical," maintaining that it allows some perpetrators to escape criminal liability when they commit a *malum in se* offense in a grossly negligent manner—the gross negligence manslaughter *mens rea*—but death does not occur in the commission of, or escape from, the crime—a causation requirement for unlawful act manslaughter.

---

[10] *Malum prohibitum* is defined as an "act that is a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral."  Malum Prohibitum, *Black's Law Dictionary* (10th ed. 2014).

We agree with the State. First, we think Thomas is too eager to rely on lines that our cases have yet to clearly draw. In *Schlossman v. State*, 105 Md. App. 277, 289–91 (1995), *overruled in part and on other grounds by Bailey v. State*, 355 Md. 287, 298 n.10 (1999), the Court of Special Appeals concluded that *malum in se* offenses are sufficient, in themselves, to establish the *mens rea* for an unlawful act manslaughter charge. But, significantly, it did not decide whether an act "dangerous to life" would suffice for the charge, regardless of whether it was *malum in se* or *malum prohibitum*. *See id.*; Moylan, *Criminal Homicide Law* § 11.5, at 215. Thus, Thomas overstates the matter when he insists that *malum in se* offenses are the **only** kind that could ever suffice for an unlawful act involuntary manslaughter charge. *See generally* Moylan, *Criminal Homicide Law* § 11.5, at 213–15.

Moreover, even if there was such a distinct line, it would only keep *malum prohibitum* offenses from being charged under unlawful act manslaughter, and not the reverse. In *Schlossman*, the intermediate appellate court stated that "homicide resulting from the perpetration of a *malum in se* unlawful act not amounting to a felony is manslaughter, regardless of whether the unlawful act was 'dangerous to life.'" 105 Md. App. at 288. Thus, the intermediate appellate court reasserted the underlying rationale for the unlawful act-gross negligence manslaughter distinction—the State is relieved from the burden of demonstrating the higher level of culpability for unlawful act manslaughter due to the seriousness of the underlying offense. The inverse of this concept is also true. When the State seeks to proceed under a gross negligence manslaughter theory, it must demonstrate the higher level of culpability, irrespective of whether the underlying offense

26

is *malum in se* or *malum prohibitum*. Consequently, the State does not benefit from any presumption in this circumstance—notwithstanding whether distribution of heroin is *malum in se* or *malum prohibitum*—and must prove the grossly negligent *mens rea* beyond a reasonable doubt.

### *(ii) Gross Negligence* Mens Rea

The State next argues that the Court of Special Appeals "usurped the role of the trier of fact and relied on unsupported assumptions" when it determined there was sufficient evidence of negligence, but not gross negligence. The State particularly takes issue with the intermediate appellate court's statement that drug dealers have "no rational interest" in making drug use more dangerous, as it believes this is "not supported by the record or reality." Specifically, the State points to the following facts to show sufficient evidence for the conviction: Thomas had no way of knowing the purity of the heroin he sold; the circumstances surrounding the timing of the sale; Thomas knew Colton was a "young boy"; Thomas knew that Colton was an addict who recently came to Maryland after a stay in prison; and Thomas knew that Colton was "desperate" for heroin and, "by inference," that he would likely consume all four bags. Thomas asserts that the evidence in this case cannot support his conviction under a gross negligence theory because it does "not show the requisite wanton disregard for human life necessary to constitute gross negligence." He states that, "absent proof that the accused or someone in his or her situation should know that amount of the substance is probably fatal," the evidence is insufficient to establish gross negligence.

We have already discussed the general principles of gross negligence in Maryland, but, before this case, Maryland appellate courts have never been asked to apply them to the distribution of drugs. Our search for law on this issue in other states has revealed only a few relevant decisions. While some states have reviewed this matter based on a theory of common law manslaughter, others have avoided such a ruling due to supervening legislation addressing drug distribution resulting in death. *See, e.g.*, Colo. Rev. Stat. § 18-3-102(e) (West 2019); Ohio Rev. Code Ann. §§ 2903.04(A), 2925.02(A)(3) (West 2019); Wis. Stat. § 940.02(2)(a) (West 2018). *See also* Wayne R. LaFave, *Criminal Law* § 15.4(e), at 1058–59 (6th ed. 2017). We review some relevant cases below to further investigate the line between ordinary negligence and criminal gross negligence in the context of the distribution of intoxicating substances.

In *Commonwealth v. Catalina*, 556 N.E.2d 973 (Mass. 1990), the Supreme Judicial Court of Massachusetts faced a set of facts similar to those presented here. There, the victim purchased three bags of a highly potent heroin, keeping one bag for herself. *See id.* at 975. The defendant-dealer warned the victim not to "do a whole" bag because of the risk of an overdose. *Id.* at 974. Still, the victim returned home, injected herself, and died from a lethal combination of heroin and alcohol. *See id.* at 975. Based on these facts, the Court determined that the evidence was sufficient to support an *indictment* for the Massachusetts equivalent of gross negligence involuntary manslaughter—an "unlawful homicide unintentionally caused by wanton or reckless conduct." *Id.* at 979. The Court starkly characterized the dangers of heroin distribution, stating that "the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a

drug is inherently dangerous and does carry a high probability that death will occur." *Id.*

at 980 (quoting *People v. Cruciani*, 70 Misc. 2d 528, 536 (N.Y. Co. Ct. 1972)).[11]

More recently, a North Carolina court determined that a circumstance in which a dealer sells a person methadone, who then fatally overdoses, after the dealer, himself, "nearly died the month before from an overdose," could support a finding of reckless conduct for involuntary manslaughter.[12] *State v. Barnes*, 741 S.E.2d 457, 465 (N.C. Ct. App. 2013).[13] Together, these cases display an approach to gross negligence manslaughter similar to the one used in Maryland—evaluating the dangers inherent in the defendant's underlying conduct in the context of attendant circumstances.

Certainly, some courts have reviewed particular factual scenarios and concluded that heroin distribution did not amount to gross negligence, but many cases are inapt, either

---

[11] In Massachusetts, a defendant can move to dismiss criminal indictments, prior to trial, based on his contention that "the indictments were not supported by sufficient evidence." *Commonwealth v. Rakes*, 82 N.E.3d 403, 413 (Mass. 2017). No such procedure exists in Maryland.

[12] *But see State v. Shell*, 501 S.W.3d 22, 30–33 (Mo. Ct. App. 2016) (defendant did not "conscious[ly] disregard . . . a risk of death to another" and could not be convicted of involuntary manslaughter because the State failed to adequately demonstrate the existence of any additional aggravating factors beyond the provision of the heroin and the Court was unwilling to "create a *per se* involuntary manslaughter rule").

[13] Some Prohibition Era cases involving the furnishing and consumption of tainted alcohol also provide an interesting analogue. *See, e.g.*, *People v. Pavlic*, 199 N.W. 373, 374 (Mich. 1924) ("If the liquor which the defendant furnished . . . was dangerous for use as a beverage, if it was of greater potency than ordinary whisky, or if it contained poisonous ingredients, . . . the defendant having distilled it himself would be charged with a knowledge of its dangerous character, and would be guilty of involuntary manslaughter."); *Thiede v. State*, 182 N.W. 570, 573–74 (Neb. 1921) (jury question on involuntary manslaughter was warranted where defendant distilled the liquor himself and there was evidence he knew it was "extremely powerful").

because the standard for criminal gross negligence requires the State to demonstrate a higher "probability of harm" than the one borne out by our cases, *see, e.g.*, *State v. Miller*, 874 N.W.2d 659, 663 (Iowa Ct. App. 2015) ("[C]riminal liability will not attach to conduct increasing the probability of the risk of harm unless the conduct made the proscribed harm 'more likely than not' to occur."); *Lofthouse v. Commonwealth*, 13 S.W.3d 236, 241 (Ky. 2000) (there must be "a substantial risk that the amount of cocaine and heroin ingested by Buford would result in his death" and the fact that the amount ingested "could be fatal" was not enough); or involve murder charges requiring a higher level of culpability than gross negligence involuntary manslaughter, *see, e.g.*, *Heacock v. Commonwealth*, 323 S.E.2d 90, 93 (Va. 1984) (cocaine dealer charged with second-degree felony murder); *Napier v. State*, 357 So. 2d 1011, 1012 (Ala. 1978) (heroin dealer charged with first-degree murder); *Commonwealth v. Bowden*, 309 A.2d 714, 715 (Pa. 1973) (heroin procurer charged with murder in the second degree).

As we reflect upon Maryland gross negligence manslaughter law generally, we discern that the Maryland appellate courts have upheld convictions—for drag racing, speeding in a highly congested area, speeding and passing in a no-pass zone, driving after repeatedly "nodding off,"[14] mishandling guns without intent to kill—when the conduct measured by the wanton and reckless standard posed no obviously greater risk than the one Thomas disregarded in distributing heroin to Colton. In none of these circumstances was

---

[14] *See Skidmore v. State*, 166 Md. App. 82, 89 (2005) ("Because Skidmore continued to drive after he was aware that he had nodded off 'a few times,' a rational trier of fact could conclude that he continued to drive in reckless disregard of the risk to human life, and that his conduct constituted gross negligence.").

the defendant's conduct proclaimed "probably fatal," the standard that Thomas urges us to adopt. Rather, their conduct posed a "high risk to human life"—or was "likely at any moment to bring harm to another." *Johnson*, 213 Md. at 533 (citation omitted).

Still, we agree with Thomas that a *per se* rule providing that all heroin distribution resulting in death constitutes gross negligence involuntary manslaughter is unwise and not in keeping with our precedent. Instead, we must consider the inherent dangerousness of distributing heroin with the attendant environmental risk factors presented by each case. *See also People v. Hall*, 999 P.2d 207, 218 (Colo. 2000) ("[I]n order to determine whether a risk is substantial, the court must consider both the likelihood that the harm will occur and the magnitude of potential harm . . . ."). Moreover, the defendant, or an ordinarily prudent person under similar circumstances, should be conscious of this risk. *See Albrecht*, 336 Md. at 500 (citation omitted).

It is undisputed that Thomas was knowingly engaged in the unregulated selling of a CDS with no known medical benefit[15]—an addictive[16] and useless poison—to customers in a region suffering from an epidemic of heroin and opioid abuse and deaths. The agreed facts provide that Thomas was surprised that Colton fatally overdosed from four bags of Banshee heroin. Assuredly, he may have felt pangs of conscience. But these facts do not

---

[15] Heroin is classified as a Schedule I drug, unlike most other opiates, which are listed on Schedule II. *See* 21 U.S.C. § 812. Schedule I drugs have "a high potential for abuse" and "no currently accepted medical uses in treatment." *Id.* § 812(b)(1)(A)–(B).

[16] *Heroin Research Report*, Nat. Inst. on Drug Abuse (June 2018), https://www.drugabuse.gov/publications/research-reports/heroin/overview ("Heroin is a highly addictive opioid drug, and its use has repercussions that extend far beyond the individual user.") [*archived at* https://perma.cc/4NXZ-369P].

overcome the risk and inherent dangerousness of the underlying activity. Indeed, according to the agreed statement of facts, "anyone in Thomas' situation would understand the dangers of heroin, and its propensity to harm physically, if not kill, individuals who are ingesting it."

The agreed facts also include a description of what Detective Johns, testifying as an expert in CDS investigations, would say at a trial—that Worcester County "has been consumed with heroin overdoses, some resulting in deaths, and that these overdoses have resulted in an acute awareness of the dangers of heroin." In his words, "heroin kills, and everyone knows it." His proffered testimony is consistent with data collected by the State of Maryland's Department of Health and Mental Hygiene regarding fatal overdoses from heroin and other opioids. In 2015, the year Colton died, there were 1,259 deaths from alcohol and drugs in Maryland—86% of these were opioid-related. *See Drug- and Alcohol-Related Intoxication Deaths in Maryland, 2015*, Md. Dep't of Health & Mental Hygiene 1, 5 (Sept. 2016), https://bha.health.maryland.gov/OVERDOSE_PREVENTION/ Documents/2015%20Annual%20Report_revised.pdf [*archived at* https://perma.cc/48X6-DHKJ]. In this State, fatal overdoses from heroin rose dramatically between 2011 and 2015, from 247 to 748 overdoses, vastly exceeding the number of deaths caused by any other drug, including fentanyl.[17] *See id.* at fig.6. In 2015, the rural counties of the Eastern

---

[17] In collecting this data, Maryland has recognized that some deaths are caused by two or more toxic substances, and that data allocating deaths by each potentially fatal drug, if all combined, may overstate the number of deaths. *See Drug- and Alcohol-Related Intoxication Deaths in Maryland, 2015*, Md. Dep't of Health & Mental Hygiene 3 (Sept. 2016), https://bha.health.maryland.gov/OVERDOSE_PREVENTION/Documents/2015% 20Annual%20Report_revised.pdf [*archived at* https://perma.cc/48X6-DHKJ].

Shore suffered 51 heroin-related deaths, including 11 deaths in Worcester County and 13 deaths in neighboring Wicomico. *See id.* at fig.8.

It is also fair to infer that Thomas subjectively knew an overdose was possible based on his statement that Colton "couldn't have overdosed **off [the amount] I sold him**." It is enough that Thomas knew about the overdose risks of heroin. That he knew about the risk but wrongly estimated the amount of heroin sufficient to kill his customer does not remove his conduct from the reckless and wanton category. Again, involuntary manslaughter does not involve an intent to kill, but only a reckless disregard of another person's life. When some quantity of heroin will kill, but variable circumstances render that quantity unpredictable, a person takes a large risk in distributing any amount above an exceedingly de minimis threshold.

Considering the agreed statement of facts, reinforced by Maryland governmental data pertaining to 2015, we are asked to decide a legal question regarding Thomas' culpability. A major component of that question relates to the degree of increased risk we attribute to the heroin, itself—or how "wanton or reckless" the distribution of heroin is exclusive of other factors. After much consideration of precedent in Maryland and elsewhere, we reach the same conclusion as the Supreme Judicial Court of Massachusetts, which stated that "the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a drug is inherently dangerous . . . ." *Catalina*, 556 N.E.2d at 980 (citation omitted). We do so with the caveat, as indicated earlier, that distribution, alone, does not *always* amount to gross negligence. This caveat is unavailing

33

to Thomas, however, because this is not a case involving the "mere act of distributing heroin," as Thomas portrays it.

A reasonable person in Thomas' place would have understood that Colton was desperate for heroin and would have realized that increased the risk of the transaction. The facts state that Colton had been abusing heroin for approximately four-and-a-half years, and Thomas knew he was a "young boy" who had been in prison in Pennsylvania sometime in the past. On the night of his fatal overdose, Colton called Thomas 27 or 28 times between 11:45 p.m. and 12:07 a.m.—more than one call per minute—until Thomas finally answered. Colton also sent multiple text messages to Thomas in that same timeframe, imploring him to "call me, please" and stating that he would "come to [Thomas]" to get the heroin. Moreover, Thomas recognized that it was "unusual" for him to meet Colton at midnight and that he "usually met him earlier." All of these facts support the inference that Colton was desperately in need of heroin and might well ingest the entire four bags of heroin immediately.

It is also relevant to distinguish the systematic and sustained heroin distributor from the infrequent or inexperienced provider. The agreed statement of facts reveals a substantial amount about Thomas' heroin distribution practices. Thomas resupplies his heroin stock "every two to three days," when he travels to Delaware to purchase five bundles (50–65 total bags of heroin) for $300. Thomas is a heroin abuser, himself; presumably consumes between 24 to 36 bags of each resupply; and sells the remainder for $10–$15 per bag, an amount which consistently nets him a profit. At the time of his arrest, Thomas possessed 13.10 grams (60 bags) of heroin. From all this, it is evident that Colton

34

was not Thomas' only client and that Thomas consistently distributed heroin to a substantial network of associates. Thus, we can infer that Thomas was aware of the risk to life posed by consistent heroin abuse, cognizant of its ill-effects, and, yet, continued to sell the drug notwithstanding its danger. *See Hall*, 999 P.2d at 220 ("In addition to the actor's knowledge and experience, a court may infer the actor's subjective awareness of a risk from what a reasonable person would have understood under the circumstances."); *Murray v. State*, 855 P.2d 350, 357 (Wyo. 1993) ("A reasonable jury could infer from Appellant's extensive experience with weapons that he was aware of, but consciously disregarded, the substantial and unjustifiable risk that the victim could be injured by a ricocheting bullet.").

The agreed facts state that Thomas sold Colton heroin only "a few times" and knew him to be a "young boy." They also inform us that Thomas had only been selling Banshee heroin for about a month. Under interrogation by police, Thomas admitted that he typically used 12 bags of heroin per day and four bags in a single shot. Thomas attempts to use these factual details as a defense, stating that he used the same amount of Banshee heroin as Colton and never overdosed from it. Yet, this information is as much a sword as a shield. Based on his own admissions, Thomas should have reasonably concluded that Colton was also likely to use all four bags in one shot—as Thomas himself does—a fact he implicitly recognized when he stated that "he couldn't have overdosed off what I sold him" because it was only four bags. Thomas sold Colton four bags of heroin, likely to be used at once, without knowing anything about the composition of the heroin he sold, about what other substances Colton was taking or might have used that day, or about Colton's tolerance given his age and recent incarceration. To knowingly distribute a dangerous, and

35

sometimes lethal, substance without such information qualifies as "a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances," *Albrecht*, 336 Md. at 500 (citation omitted). Failure to obtain this information represents an "indifference to [the] consequences" that may result. *Id.*

We are not persuaded by Thomas' defense that the State failed to prove that the four bags constituted a lethal dose. The consequences of ingesting heroin are unpredictable and what constitutes a lethal dose varies based on the circumstances.[18] When dealing with street heroin, what is lethal will depend not only on the health of the particular individual and his tolerance for heroin, but on what other toxic substances are mixed with the heroin, as well as what other substances the individual has ingested. The specifics as to the cause of Colton's death are revealed by the Medical Examiner's report and discussed in detail in the following section.

To review, we consider whether Thomas' conduct amounted to a "wanton and reckless disregard for human life," *Albrecht*, 336 Md. at 500 (citation omitted)—a gross departure from the conduct of an ordinarily prudent person, without regard to the consequences or the rights of others, and likely to bring harm at any moment. Thomas sold heroin to a desperate young man, knowing that the consumption of heroin could be deadly. He had extensive experience with heroin—distributing it widely, in a manner sure to net a

---

[18] *Information Sheet on Opioid Overdose*, World Health Org. (Aug. 2018), https://www.who.int/substance_abuse/information-sheet/en/ ("Risk factors for overdoses with prescribed opioids include a history of substance use disorders, high prescribed dosage (over 100mg of morphine or equivalent daily), male gender, older age, multiple prescriptions including benzodiazepines, mental health conditions and lower socioeconomic status.") [*archived at* https://perma.cc/PBD4-CKDB].

36

profit, and with such frequency that he travelled across state lines two to three times a week to procure it—and was knowledgeable of its dangers. Yet, he either willfully failed to obtain the necessary information to help reduce the risks of his behavior, or he was indifferent to mitigating these risks. Either way, his conduct posed a high degree of risk to those with whom he interacted. Whether Thomas' motivation was to create a steady source of income, to feed his own addiction, or something more sinister, is of no moment, as intent to kill is not an element of gross negligence involuntary manslaughter.

Nor do we agree with the Court of Special Appeals' rationale that requisite intent for involuntary manslaughter cannot be found because we should infer that a drug dealer wishes for his customers to remain alive, so he can sell them more heroin. The intention required for manslaughter must "amount[] to a disregard of the consequences which might ensue and indifference to the rights of others . . . ." *Albrecht*, 336 Md. at 500 (citation omitted). This criminal disregard of consequences can well co-exist with a desire to make a profit with more drug sales. Thus, we hold that that the record contained sufficient evidence of gross negligence to support a conviction for gross negligence manslaughter beyond a reasonable doubt.

*(iii) Actual and Legal Causation*

Finally, the State disagrees with the Court of Special Appeals' determination that the "causal chain" has been broken and argues that it incorrectly applied the same causation analysis to both unlawful act and gross negligence manslaughter. It contends that the intermediate appellate court's view of causation is too narrow and inconsistent with Maryland precedent. Specifically, the State urges that Thomas is the "but for" cause of

37

Colton's death—selling him four bags of heroin when he was "clearly desperate to get high"—and that Colton's death "was neither remote nor unforeseeable." Moreover, the State maintains, the defendant's act need not be the "sole reason" for the harm, and it is not material that Colton "injected himself or that Thomas did not adulterate the heroin."

Thomas does not appear to contest the State's argument. Rather, he asserts that the State failed to show causation "as to the unlawful act modality," rather than gross negligence manslaughter.[19] Still, we review this element to provide clarity to our decision.

"A causal connection between . . . gross negligence and death must exist to support a conviction . . . ." *Albrecht*, 336 Md. at 499 (citation omitted). *See also Craig v. State*, 220 Md. 590, 597 (1959) (negligence "must be the proximate cause of death"); *Duren*, 203 Md. at 593 ("Necessarily, the criminal negligence must have produced the death if the accused is to be guilty of manslaughter."); *Blackwell v. State*, 34 Md. App. 547, 557 (1977) (there must "be some reasonable connection between the act or omission and the death that ensued") (citation omitted); *Mills*, 13 Md. App. at 200. Thus, for a charge of gross negligence involuntary manslaughter, the defendant's gross negligence must be the proximate cause of the victim's death—meaning the (1) actual, but-for cause and (2) legal cause.[20] *See Jackson v. State*, 286 Md. 430, 442–43 (1979); LaFave, *Criminal Law*

---

[19] When questioned at oral argument, Thomas' counsel again stated that he "challenged causation as the [*sic*] unlawful act" and that he had "not raised an argument as to gross negligence causation." Rather, counsel asserted that it was the State's "burden to show error in [the Court of Special Appeals'] analysis."

[20] The dissent applies incorrect causation principles to the present case. The gross negligence involuntary manslaughter causation standard is different from the unlawful act manslaughter causation standard. *Compare Craig v. State*, 220 Md. 590, 597 (1959)

§ 6.4(a), at 437 ("It is required, for criminal liability, that the conduct of the defendant be both (1) the actual cause, and (2) the 'legal' cause (often called 'proximate' cause) of the result.").

"In the usual [criminal] case there is no difficulty in showing the necessary causal connection between conduct and result," LaFave, *Criminal Law* § 6.4(a), at 438, and, hence, it is atypical for our courts to discuss actual cause at length. Yet, this case presents some factual nuances worthy of addressing. "The concept of actual cause 'is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence . . . of a causal relation as laypeople would view it.'" *Paroline v. United States*, 572 U.S. 434, 444 (2014) (citation omitted). For conduct to be the actual cause of some result, "it is almost always sufficient that the result would not have happened in the absence of the conduct"—or "but

---

(grossly negligent act "must be the proximate cause of death" for gross negligence involuntary manslaughter), *with Schlossman v. State*, 105 Md. App. 277, 284 (1995) (death must occur "in the course of committing a crime or even a civil wrong" for unlawful act involuntary manslaughter) (citation omitted). The dissent correctly notes that unlawful act manslaughter is the "junior varsity manifestation" of felony murder, and, thus, "its rationale parallels that of the felony murder doctrine in every regard." Charles E. Moylan, Jr., *Criminal Homicide Law* § 11.1, at 207 (2018). It ignores, however, that gross negligence involuntary manslaughter is a less culpable form of depraved-heart murder. *Id.* § 12.1, at 223. Unlawful act manslaughter's relation to felony murder explains the added "continuous transaction" element to the causation requirement, as the perpetrator need not have any particular *mens rea* as to the death, but only that necessary to engage in the underlying felony. *See Mumford v. State*, 19 Md. App. 640, 643 (1974). The *Maryland Pattern Criminal Jury Instructions* recognizes this distinction—providing that, for unlawful act involuntary manslaughter, the State must prove that "that act resulting in the death of [the victim] occurred **during the [commission]** of the [unlawful act]." § 4:17.9, at 705 (2018) (emphasis added). Yet, for gross negligence involuntary manslaughter, the instructions only require that the "grossly negligent conduct **caused** the death of [the victim]." *Id.*, at 704 (emphasis added). As discussed in detail, this case is about gross negligence involuntary manslaughter, not unlawful act involuntary manslaughter. The dissent exclusively relies on cases involving felony murder. These cases are inapt.

39

for" the defendant's actions. LaFave, *Criminal Law* § 6.4(b), at 439. *See also Jackson*, 286 Md. at 442 ("Actual causation may be examined in terms of the *sine qua non*.").

Maryland gross negligence manslaughter cases have evaluated the actual, or but-for, cause of a given result on only a few occasions. In one such case, the Court of Special Appeals determined that a mutual agreement to engage in grossly negligent conduct can be sufficient to find causation, even where the victim was, himself, engaged in the grossly negligent act. In *Goldring v. State*, 103 Md. App. 728, 730–31 (1995), two racers, Hall and Goldring, participated in a drag race on a two-lane country highway with a posted 45-mile-per-hour speed limit. During the race, Hall accidently struck the side of Goldring's vehicle and lost control of his car. *See id.* at 731. Hall and two pedestrians were killed. *See id.* The court concluded that Goldring's conduct in competing in the drag race bore a sufficiently direct causal connection to Hall's death to support Goldring's conviction for involuntary manslaughter, and Goldring was convicted in the death of Hall and the two pedestrians. *See id.* at 738.

We have also stated that a defendant does not "cease to be responsible for his otherwise criminal conduct because there were other conditions which contributed to the same result." *Palmer v. State*, 223 Md. 341, 353 (1960) (citation omitted). *See also Burlas v. State*, 185 Md. App. 559, 578 (2009) (that the victim's car did not pass inspection or might have sped up did not relieve defendant of responsibility). In *Palmer*, we held a mother liable for gross negligence involuntary manslaughter when she failed to prevent her husband's savage beatings of her daughter. Significantly, the Court concluded that it was not necessary that the mother's grossly negligent conduct be the sole reason for her

daughter's death. *See Palmer*, 223 Md. at 353. Ultimately, her unwillingness to aid her child, which was her duty, resulted in the child's death and she, too, could be convicted of involuntary manslaughter. Thus, we took a broader view of actual cause, implicitly recognizing that the grossly negligent conduct need only be the but-for cause of the death, and not an independently sufficient cause of it.

Using similar reasoning, we determined that the defendant need not be the person who actually caused the death where each participant "aided, abetted, and encouraged the other to engage" in the conduct that resulted in the victim's demise. *Alston v. State*, 339 Md. 306, 321 (1995). *See also Hensen v. State*, 133 Md. App. 156, 171–72 (2000) (participation in an informal street race is sufficient to establish causation, even if defendant's car never contacted the victim's car); *Pineta v. State*, 98 Md. App. 614, 626 (1993) ("[W]here a third person has been killed as a direct consequence of the illegal racing of motor vehicles, any driver participating in the race may be convicted of manslaughter by automobile . . . .").

In this case, Colton died seated on the toilet, passed out, with his jaw propped against the vanity sink top. He was holding one white Banshee heroin bag and three more bags had fallen to the floor beneath him—all empty. He possessed heroin paraphernalia on his person and in his bedroom. Thomas admitted to selling heroin to Colton "a few times" and stated that he sold him four bags of Banshee heroin on the night he fatally overdosed. The Medical Examiner stated that Colton died of "alcohol and narcotic (free morphine) intoxication." Specifically, the report listed Colton's heart blood as containing 0.08%

41

ethanol, 240 mcg/L free morphine, and 6-Monoacetylmorphine. No other drugs were found in his system.

While it is accurate, strictly speaking, to say that the heroin and alcohol combined to cause Colton's death, the question is whether the harm would have occurred "in the absence of" Thomas' distributing heroin to Colton. *Burrage v. United States*, 571 U.S. 204, 211 (2014) (citation omitted). *See also United States v. Alvarado*, 816 F.3d 242, 244 (4th Cir. 2016) ("[B]ecause there was no evidence in the record that [the victim] could have died without the heroin, the jury's verdict was necessarily consistent with the Supreme Court's requirement of but-for causation [from *Burrage*]."). The State need not demonstrate that the heroin was independently sufficient to cause Colton's death, only that it was the but-for cause. *See Burrage*, 571 U.S. at 219 (there could be no conviction where there was no evidence that the victim "would have lived but for his heroin use").

The evidence shows that Colton only ingested heroin and alcohol and there is no allegation to the contrary. A blood alcohol content ("BAC") of 0.08%—Colton's heart BAC—is the "legal limit" for *driving* in Maryland. *See* Maryland Code (2005, 2012 Repl. Vol.), § 11-174.1(a) of the Transportation Article. We can safely presume that a lethal dose of alcohol would be much higher.[21] No other drugs were found in Colton's system and the autopsy found no latent medical condition that otherwise contributed to his death.

---

[21] The Medical Examiner's report also lists Colton's vitreous alcohol content ("VAC") as being 0.12%. Maryland Code (2012, 2012 Repl. Vol.), § 16-205.1(b)(1)(i)(2) of the Transportation Article, provides for the suspension of a person's driver's license if their blood alcohol test returns a result of 0.15% or higher. We apply the same logic as above in concluding that a VAC of 0.12% is not close to a lethal concentration.

Therefore, Colton's death was either caused by heroin or alcohol, and the evidence and common sense demonstrate that it was not caused by alcohol.

Regarding the amount of heroin consumed, out-of-state guidance and scientific literature demonstrate that 240 mcg/L free morphine—the concentration found in Colton's heart blood—is within the range generally accepted to constitute a lethal dose.[22] Moreover, in *Commonwealth v. Vaughn*, 687 N.E.2d 270, 271 (1997), the Appeals Court of Massachusetts set the "toxic level" of heroin-produced morphine at 200 mcg/L. The court was unbothered by the fact that the victim only had 130 mcg/L free morphine in her system—lower than Colton's concentration—along with a 0.20% BAC—much higher that Colton's concentration—in concluding that heroin caused her death. *See id.* at 271–72. There is no evidence in the record that Colton could have died without the heroin, and this is enough to find but-for causation. *See Alvarado*, 816 F.3d at 244.

Again, Thomas sold Colton four bags of Banshee heroin. Colton ingested only these four bags within three hours after purchasing them, and the Medical Examiner found

---

[22] *Toxicology*, N.C. Office of the Chief Med. Exam'r (June 30, 2017) https://www.ocme.dhhs.nc.gov/toxicology/index.shtml (listing 100–400 mcg/L of morphine as a "lethal dose") [*archived at* https://perma.cc/47FB-B5NJ]; Julia Pearson, PhD, et al., *Postmortem Toxicology Findings of Acetyl Fentanyl, Fentanyl, and Morphine in Heroin Fatalities in Tampa, Florida*, Acad. Forensic Pathology 5(4): 680 (Dec. 2015) ("In the 26 heroin deaths that did not also involve a fentanyl derivative, free and total peripheral blood morphine concentrations averaged [160 mcg/L] and [350 mcg/L] respectively."); M. Schilz & A. Schmoldt, *Therapeutic and Toxic Blood Concentrations of More Than 800 Drugs and Other Xenobiotics*, Pharmazie 58: 458 (2003) (100–400 mcg/L of morphine is a "comatose-fatal" dosage). *See also* Ashley D. Ellis, et al., *Identifying Cases of Heroin Toxicity Where 6-Acetylmorphine (6-AM) Is Not Detected by Toxicological Analyses*, Forensic Sci., Med. & Pathology 12: 245 (2016) (morphine range in 127 intravenous heroin deaths was between 130–1,480 mcg/L).

nothing more in his system.  As discussed above, a BAC of 0.08% is indicative of only moderate intoxication, whereas a blood content of 240 mcg/L free morphine is within the generally accepted lethal range.  Without the heroin Thomas supplied, Colton would not have died, and while the evidence may not establish that the heroin was independently sufficient to cause Colton's death, it does demonstrate that it was the but-for cause.  For these reasons, there is enough evidence in the record for a trier of fact to conclude beyond a reasonable doubt that the heroin was the but-for cause of Colton's death.

Additionally, the State must demonstrate that Thomas was the legal cause of Colton's death.  The concept of legal causation "is applicable in both criminal and tort law, and the analysis is parallel in many instances." *Paroline*, 572 U.S. at 444 (citation omitted). Moreover, it "turns largely upon the **foreseeability** of the consequence of the defendant's" conduct.  *Palmer*, 223 Md. at 352 (emphasis added).  Thus, "it is not essential that the ultimate harm which resulted was [actually] foreseen or intended." *Albrecht*, 336 Md. at 499 (citation omitted).  "It is sufficient that the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant." *Jackson*, 286 Md. at 441 (quoting 1 Francis Wharton & Ronald A. Anderson, *Wharton's Criminal Law* § 68 (1957)).

We agree with the Supreme Judicial Court of Massachusetts' assertion that "[i]ntervening conduct that is reasonably foreseeable will not relieve the defendant of criminal responsibility." *Catalina*, 556 N.E.2d at 980.  This is supported by our ruling in *Minor v. State*, 326 Md. 436, 443–44 (1992), wherein we upheld a reckless endangerment conviction for an individual who handed a loaded gun to the victim, who then shot himself

in a game of "Russian roulette." The fact that the victim pulled the trigger was not sufficient to cut off the defendant's liability. *See also Mills*, 13 Md. App. at 202 (knocking the gun from the defendant's hand was not a supervening cause sufficient to relieve the defendant of criminal liability). Holding a supplier of a deadly product accountable for its deadly effects does not amount to "apportion[ing] criminal liability for manslaughter merely because of bad luck." *Thomas*, 237 Md. App. at 538. Ingesting heroin is a foreseeable result of its supply, *see Catalina*, 556 N.E.2d at 980 ("It is untenable to suggest that heroin consumption is not a reasonably foreseeable consequence of selling that drug to a known addict."), and death a foreseeable consequence of its ingestion. Therefore, it was eminently foreseeable that Colton would use the heroin that Thomas sold him and potentially die as a result.

That the victim was not blameless is plain, but it is also irrelevant to our present analysis. This Court has held that contributory negligence is not a defense to involuntary manslaughter. *See Duren*, 203 Md. at 593 ("If the appellant was guilty of gross negligence, he cannot excuse his conduct and escape the consequences by showing that the deceased was guilty of contributory negligence."). Assuredly, Colton paid the ultimate price for his conduct. The only remaining question is whether Thomas, too, should be held to our most minimal level of criminal homicide culpability—involuntary manslaughter—in the death of Colton Matrey.

This Court need not conclude, and the State need not prove, that the four bags of heroin were the only reason Colton overdosed and died. Rather, there must be sufficient evidence in the record to determine that Colton would not have died but for the heroin and

that his death was a foreseeable consequence of Thomas selling him the four bags of heroin.

The State has established causation in this case. We hold that there is sufficient evidence in the record to conclude that Thomas' conduct was both the actual and legal cause of Colton's death. Thus, for the above reasons, we hold that the trial court did not err in convicting Thomas of gross negligence involuntary manslaughter.[23]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AS TO GROSS NEGLIGENCE MANSLAUGHTER. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY FOR THE MANSLAUGHTER CONVICTION IN ACCORDANCE WITH THIS OPINION. THE COURT OF SPECIAL APPEALS SHALL CONSIDER ARGUMENTS MADE BY THOMAS REGARDING MERGER OF THE MANSLAUGHTER AND DISTRIBUTION OF HEROIN CHARGES. COSTS TO BE PAID BY RESPONDENT.**

---

[23] Thomas argues the Circuit Court for Worcester County "erred in imposing separate sentences for manslaughter and distribution of heroin," and that, if this Court affirms the manslaughter conviction, it must remand to the intermediate appellate court to consider the merger issue. We agree that we must remand. *Certiorari* was not requested as to this issue, and we do not address its merits. The intermediate appellate court recognized that it did not need to address this issue because it reversed the manslaughter conviction entirely. *See Thomas v. State*, 237 Md. App 527, 530 n.3 (2018). We remand so that the Court of Special Appeals can now address the issue.

Circuit Court for Worcester County
Case No.: 23-K-16-000038
Argued: November 29, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 33

September Term, 2018

———————————————————

STATE OF MARYLAND

v.

PATRICK JOSEPH THOMAS A/K/A
PATRICK JOSEPH PATRICK

———————————————————

Barbera, C.J.,
Greene,
McDonald,
Watts,
Hotten,
Getty,
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

———————————————————

Dissenting Opinion by Hotten, J., which
Greene and Getty, JJ., join.

———————————————————

Filed: June 24, 2019

I respectfully dissent from the majority opinion. Undeniably, the distribution, use, and overdose of heroin and other opioids has received significant local and national attention from the general public, the Judiciary, state legislatures, and news organizations. The consequences of opioid use in our State can only be categorized as an epidemic, claiming responsibility for 86% of all alcohol and drug related deaths in Maryland in 2015. *See Drug- and Alcohol-Related Intoxication Deaths in Maryland, 2015*, Md. Dep't of Health & Mental Hygiene 1, 5 (Sept. 2016), https://bha.health.maryland.gov/OVERDOSE_PREVENTION/Documents/2015%20Ann ual%20Report_revised.pdf. The Majority opinion seeks refuge in these statistics to support its conclusion that an individual who does nothing more than sell heroin to another can be convicted of involuntary manslaughter when the buyer, on their own volition, injects the heroin and overdoses.

I am unable to reach such a conclusion. There is not sufficient evidence in the present case to establish a causal relationship between the mere sale of heroin and the subsequent use and fatal overdose of the buyer. For these reasons, I would affirm the judgment of the Court of Special Appeals.

### *The State Failed to Provide Sufficient Evidence to Sustain a Conviction of Involuntary Manslaughter for the Mere Distribution of Heroin*

The Majority correctly points out that the State bears the burden of establishing a causal relationship between Mr. Thomas's sale of heroin and Mr. Matrey's overdose beyond a reasonable doubt. Maj. Op. at 43; *see Palmer v. State*, 223 Md. 341, 353, 164 A.2d 467, 474 (1960) (commenting that a defendant "is only criminally liable for what he

has caused, that is, there must be a causal relationship between his act and the harm sustained for which he is prosecuted."). However, the Majority goes on to conclude that "there is enough evidence in the record for a trier of fact to conclude beyond a reasonable doubt that the heroin was the but-for cause of [Mr. Matrey's] death." Maj. Op. at 44. I am unable to reach a similar conclusion.

We have explained that "there must be some nexus between the killing and the underlying felony. Mere coincidence between the underlying felony and the killing is not enough; the conduct causing death must be in furtherance of the design to commit the felony." *Watkins v. State,* 357 Md. 258, 272, 744 A.2d 1, 8-9 (2000). [1] There is a causal relationship between a felony and a death when the two are part of a "continuous transaction" and "the felony murder doctrine applies when the felony and the homicide are parts of one continuous transaction and are closely related in point of time, place, and causal connection." *See Yates v. State*, 429 Md. 112, 127, 55 A.3d 25, 34 (2012) (footnote omitted). Furthermore, the grossly negligent variant of involuntary manslaughter requires that the defendant's actions be the legal, but-for cause of the victim's death.[2] The Majority

---

[1] Judge Charles E. Moylan's treatise, which the Majority cites throughout its opinion, describes unlawful act-manslaughter as "the junior varsity manifestation of common law felony murder" and explains, "its rationale parallels that of the felony murder doctrine in every regard." The Hon. Charles E. Moylan, Jr., *Criminal Homicide Law,* § 11.1, p. 207 (2001). This necessarily extends to the causation rules. Accordingly, prior case law regarding the causal relationship in felony murder is instructive in analyzing the causal relationship in involuntary manslaughter.

[2] This but-for causation element is similarly a required finding to convict a defendant of the unlawful act variant of involuntary manslaughter. *See Schlossman v. State*, 105 Md. App 277, 292, 659 A.2d 371, 378 (1995). Therefore, case law that addresses

2

accurately explains that "[t]he legal cause analysis 'turns largely upon the foreseeability of the consequence' of the defendant's acts or omissions and whether 'the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant.'" Maj. Op. at 14-15 (quoting *Palmer*, 223 Md. at 352-53, 164 A.2d at 474 (citation omitted)).

The Majority references a number of non-drug related cases in an attempt to flesh out and analogize the "factual nuances" of the present case. Maj. Op. at 39. In *Palmer v. State*, we upheld a defendant's involuntary manslaughter conviction where the defendant negligently and willingly allowed her boyfriend to beat their 20-month-old infant to death. 223 Md. at 353, 164 A.2d at 474. In *Minor v. State*, we upheld a reckless endangerment conviction for a defendant who handed a loaded gun to the victim, who then shot himself while playing a game of "Russian Roulette." 326 Md. 436, 443-44, 605 A.2d 138, 141-42 (1992). In *Goldring v. State*, the Court of Special Appeals affirmed a defendant's involuntary manslaughter conviction based on the defendant's participation in an illegal drag race, which resulted in the crash and death of another driver. 103 Md.App. 728, 730-31, 654 A.2d 939, 940 (1995). In *Alston v. State*, we upheld a defendant's depraved-heart murder conviction where he knowingly engaged in a gun battle in a residential

---

the but-for causation requirement in the felony murder and unlawful act involuntary manslaughter context is instructive and insightful to the grossly negligent involuntary manslaughter causation analysis presently before this Court.

3

neighborhood, which resulted in a bystander being shot and killed by another participant in the shoot-out. 339 Md. 306, 307-08, 662 A.2d 247, 247-48 (1995).

I do not challenge the conclusions reached by this Court and the Court of Special Appeals in the above referred cases. Rather, I observe that those cases are readily distinguishable from the present case because the defendants' actions and the victims' death were "parts of one continuous transaction and [were] closely related in point of time, place, and causal connection." *Yates v. State,* 429 Md. 112, 127, 55 A.3d 25, 34 (2012) (footnote omitted). The circumstances in the present case are starkly different. Mr. Thomas was not physically present with Mr. Matrey when Mr. Matrey injected the heroin; he was unaware of what, if any, other substances were ingested by Mr. Matrey within the relevant period of time; he was not in a position to save Mr. Matrey when he overdosed; he did not personally prepare the heroin dose and injection for Mr. Matrey; and he did not engage in "collective madness display[ing] a wanton and depraved indifference to any human life that might randomly fall within their overlapping and deadly enfilades." *Alston,* 339 Md. at 309, 662 A.2d at 248. Mr. Thomas's sale of heroin was not "reasonably related" to the fatal use of the substance by Mr. Matrey where the consumption occurred outside of the Mr. Thomas's presence, at a different time, in a different place from the completed sale, and with no other involvement from Mr. Thomas. *See Palmer*, 223 Md. at 353, 164 A.2d at 474.

The postmortem examination conducted by the Office of the Chief Medical Examiner opined that Mr. Matrey "died of alcohol and narcotic (free morphine)

4

intoxication." The free morphine tested positive for 6-Monoacetylmorphine, the presence of which "is unequivocal confirmation of heroin usage." Christopher J. Keary, et al., *Toxicologic Testing for Opiates: Understanding False-Positive and False-Negative Test Results*, Prim. Care Companion for CNS Disord. (2012). The Majority concludes that even with the presence of alcohol in Mr. Matrey's system, the undisputed presence of heroin in Mr. Matrey's body was sufficient to "demonstrate that it was the but-for cause[]" of his death. Maj. Op. at 44. However, when police officers searched Mr. Matrey's bedroom, they discovered a prescription pill bottle containing tramadol, an opioid analgesic, Schedule IV – Controlled Dangerous Substance. Importantly, both tramadol and heroin convert into free morphine when they are metabolized in the body. It is therefore unclear whether Mr. Matrey also ingested tramadol, along with heroin and alcohol, and how that may have impacted his fatal overdose. Accordingly, the Majority's reasoning that Mr. Matrey's "death was either caused by heroin or alcohol, and the evidence and common sense demonstrate that it was not caused by alcohol[,]" is flawed. Maj. Op. at 43. The evidence does not establish that the heroin was independently sufficient to cause Mr. Matrey's death. The facts cannot sustain a finding of legal, but-for causation.

Several out-of-state, drug-related cases cited by the Majority and the State are similarly inapplicable. In *Commonwealth v. Catalina*, the Supreme Judicial Court of Massachusetts upheld the defendant's indictment for "unlawful homicide unintentionally caused by wanton or reckless conduct[,]" after selling the victim a "very potent" variety of

5

heroin. 407 Mass. 779, 780, 789, 556 N.E.2d 973, 974, 979 (1990).[3] In contrast, the type

of heroin sold by Mr. Thomas was not categorized as "very potent," and Mr. Thomas would

have testified to having injected the same dose as Mr. Matrey without any instances of

overdosing. *See also State v. Barnes*, 741 S.E.2d 457, 465 (N.C. Ct. App. 2013) (upholding

a conviction of involuntary manslaughter where the victim fatally overdosed, after the

defendant had "nearly died the month before from an overdose"); *Heacock v.*

*Commonwealth*, 228 Va. 397, 403-04, 323 S.E.2d 90, 93-94 (1984) (upholding a conviction

of second-degree felony murder where the defendant prepared several doses of cocaine for

injection, resulting in the first person to be injected suffering a seizure, and the second

person fatally overdosing); *but see State v. Shell*, 501 S.W.3d 22, 30-33 (Mo. Ct. App.

2016) (reversing a conviction of involuntary manslaughter where the defendant merely

distributed heroin to the victim, without any additional causal factors, who fatally

overdosed from its subsequent injection).

However, the Kansas Supreme Court, in *State v. Mauldin*, addressed the causal

relationship standard for murder-related charges stemming from the distribution of heroin

---

[3] The State cites to *Catalina* and other out-of-state cases to support the position that there was a reasonable causal relationship in the present case. The Majority, on the other hand, cites these cases to support its conclusion "that the record contained sufficient evidence of gross negligence[.]" Maj. Op. at 37. While there must be sufficient evidence to support a finding of causation and gross negligence separately, it is clear that the analysis for the two are intertwined and often involve the same or overlapping factual bases. In the present case, the facts, or lack thereof, that are considered in the causation analysis may also be considered in the gross negligence analysis – *i.e.*, Mr. Thomas sold Mr. Matrey the heroin, Mr. Thomas did not prepare a specific dose or inject Mr. Matrey with the heroin, the heroin sold was unadulterated, Mr. Matrey injected himself at a later time and in his own home, and he ingested alcohol prior to his death, in conjunction with his heroin use.

under facts that are nearly identical to those in the present case. In *Mauldin*, the defendant was charged with felony murder after selling heroin to the victim who ultimately took the heroin to another location, injected himself with a dose determined by himself, and overdosed. 215 Kan. 956, 957, 529 P.2d 124, 125 (1974). The Kansas Supreme Court upheld the trial court's dismissal of the charges, explaining that "the defendant's only connection with the homicide was that he sold a quantity of heroin to the deceased who some time later, voluntarily and out of the presence of the defendant, injected himself with an overdose and died as a result." *Id.* at 958, 529 P.2d at 126. Similarly here, "[Mr.] Thomas sold [Mr. Matrey] four bags of heroin. Later, at another time, in another place, [Mr. Matrey] injected himself with an amount of heroin that he chose. He used it in conjunction with alcohol, which may have intensified the effect." *Thomas v. State*, 237 Md.App. 527, 535, 186 A.3d 857, 862 (2018).

As the Court of Special Appeals observed, "[i]t is not impossible to imagine scenarios in which there will be a sufficient causal connection between the sale of heroin and the victim's death to satisfy this element of . . . involuntary manslaughter." *Id.* at 536, 186 A.3d at 862. While acknowledging the possibility of these scenarios, I disagree with the Majority's belief that the present case fits within those parameters. The facts before us do not support a finding of legal, but-for causation, or a conviction of involuntary manslaughter.

7

***Murder-Related Charges Arising from the Distribution of Heroin is a Policy Concern Best Left to the Maryland General Assembly***

The State in its brief admits that, "[d]esperate to stem the tide of deaths, law enforcement officials in Maryland and across the country have begun charging heroin dealers with murder-related charges in an effort to reduce the availability of the drug.[] The prosecution in this case reflects those efforts." The State, therefore, is calling upon this Court to inject itself in matters that should be left to the General Assembly. By its own admission, the State is seeking to modify existing law, not through the proper avenue of the General Assembly, but through this Court.

Not only does the State ask this Court to exercise legislative authority; it asks this Court to do precisely what the General Assembly has declined to do in the last several legislative sessions. Numerous bills have been introduced before the General Assembly that would deem the distribution of heroin, fentanyl, and other opioids, which resulted in the death of the user, a felony subject to up to 30 years imprisonment. These bills received either unfavorable reports following a hearing by the assigned committee, or were stalled before the committee, never proceeding to a vote at all. *See* Md. S.B. 303 (2015 Legis. Session) (receiving an unfavorable report by the Senate Judicial Proceedings Committee; withdrawn); Md. H.B. 612 (2017 Legis. Session) (stalling in the House Judiciary Committee); Md. H.B. 1730 (2018 Legis. Session) (stalling after a first reading in the House Rules and Executive Nominations Committee); Md. S.B. 570 (2019 Legis. Session) (receiving an unfavorable report by the Senate Judicial Proceedings Committee).

8

Importantly, Senate Bill 539 was introduced before the General Assembly in 2017. As introduced, the Bill was titled "Distribution of Opioids Resulting in Death[,]" and "prohibit[ed] a person from distributing certain opioids or opioid analogues, the use of which caus[ing] the death of another[.]" Md. S.B. 539 (2017 Legis. Session). The original text of the bill provided that anyone convicted of such conduct would be found guilty of a felony and subject to imprisonment for up to 30 years. While the bill ultimately passed in both Houses and was signed into law by the Governor, it was amended beyond recognition. The final bill, codified at Maryland Code, Criminal Law Article ("Crim. Law") §§ 5-602, 5-608.1, was titled "Distribution of Controlled Dangerous Substances – Fentanyl" and "prohibit[ed] a person from . . . knowingly distributing a certain mixture of controlled dangerous substances[.]" Md. Chapter Law 539 (2017 Legis. Session). Notably, the Chapter Law did not address the distribution of opioids resulting in death, let alone further criminalize and provide specific penalties for such conduct.

Efforts taken by the General Assembly make clear that the establishment and recognition of such a crime as charged in the present case is a task for legislators and policy-makers, not judges. The role of this Court is to ascertain and effectuate the intent of the General Assembly, not undermine and contradict it. *See Armstead v. State*, 342 Md. 38, 56, 673 A.2d 221, 229 (1996). The General Assembly has declined to pass a bill that would create a statutory offense for the distribution of heroin and other opioids, which result in the death of another, evidencing their intent to not criminalize such conduct as an independent murder-related conviction. By holding that the State, under the facts before

9

us, may convict an individual of a murder-related offense for a death connected to the distribution of heroin, the Majority is stepping into the role of a policy-maker, an action in direct contravention of the General Assembly's unambiguous election not to pass equivalent legislation criminalizing such conduct.

## *Conclusion*

The State has not provided sufficient evidence establishing legal, but-for causation between Mr. Thomas's distribution of heroin and Mr. Matrey's fatal overdose to sustain an involuntary manslaughter conviction. Mr. Thomas sold Mr. Matrey the amount of heroin Mr. Matrey requested, who then, "at another time, in another place, [] injected himself with an amount of heroin that he chose." *Thomas v. State*, 237 Md.App. 527, 535, 186 A.3d 857, 862 (2018). The record is devoid of any facts other than these that tie Mr. Thomas to Mr. Matrey's unfortunate overdose. *Compare People v. Erb*, 70 A.D.3d 1380, 1381, 894 N.Y.S.2d 266, 267 (2010) (holding that the evidence was insufficient to establish criminal liability where the defendant "did not procure or inject the drugs that caused the death of the victim, nor did he place her in a location that made her less likely to obtain medical assistance[]"), *with Commonwealth v. Vaughn*, 43 Mass.App.Ct. 818, 823, 687 N.E.2d 270, 273 (1997) (defendant convicted of involuntary manslaughter after injecting heroin into the victim). "Here, [] where the causal chain was broken, there can be no liability for . . . involuntary manslaughter." *Thomas*, 237 Md.App. at 536, 186 A.3d at 863.

For these reasons, I respectfully dissent, and would affirm the judgment of the Court of Special Appeals.

10

Judge Greene and Judge Getty have authorized me to state that they join in this opinion.